Filed 11/3/20  P. v. Brown CA2/6
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B291733 |
| Plaintiff and Respondent, | (Super. Ct. No. 1442714) (Santa Barbara County) |
| v. | |
| JOSEPH IRBY BROWN, | OPINION ON REHEARING |
| Defendant and Appellant. | |

Joseph Irby Brown appeals from the judgment after the jury convicted him of two counts of second degree robbery (Pen. Code,[1] § 211).  As to the first count (bank robbery), the jury also convicted Brown of resisting an officer by threats or violence (count 3, § 69).  As to the second count (gas station robbery), the jury also convicted Brown of wearing a mask or disguise to avoid detection (count 4, § 185, a misdemeanor) and found true an enhancement for use of a deadly weapon (§ 12022, subd. (b)(1)).

---

[1] Unless otherwise noted, all subsequent statutory references are to the Penal Code.

Brown admitted that he suffered two prior serious felony convictions (§ 667, subd. (a)(1)) and two prior strikes (§ 667, subds. (d)(1), (e)(1)).  The trial court sentenced him to state prison for a determinate term of 27 years and a consecutive indeterminate term of 50 years to life.

Brown contends:  (1) his confession was involuntary, (2) the trial court improperly admitted, and failed to properly instruct regarding, expert opinion evidence as to his mental state, (3) the judgment must be reversed for cumulative prejudice, (4) the case must be remanded for consideration of mental health diversion, (5) the case must be remanded to allow the trial court to exercise discretion whether to strike the serious felony priors, and (6) the term for the misdemeanor count must be stayed.

We reverse in part.  We find the confession to the gas station robbery involuntary and reverse counts 2 and 4.  We conditionally reverse counts 1 and 3 and remand for the trial court to consider mental health diversion.  We also remand for the trial court to exercise its discretion whether to strike the serious felony priors at resentencing.  We otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Gas station robbery*

Shortly before 4:00 a.m., a man entered the convenience store of a USA Gasoline station in Santa Barbara. He was wearing a black sweatshirt with the hood pulled down low and a bandana covering his mouth.  Only his eyes were visible.  A sock was on one hand and a glove on the other.  He walked directly to the cash register holding a 10-inch knife.

The man pointed the knife at the employee, N.C., and demanded money.  When she opened the cash register, he took

2

the cash, dropping some outside as he fled.  N.C. told police she did not believe she recognized him as a customer.

Later that morning, Brown's girlfriend, A.O., came into the store.  N.C. looked scared and said she was robbed.  A.O. asked if she knew who the robber was and how many people were involved.  She purchased beer, using cash.  N.C. recognized one of the dollar bills with "love for me means a lot" written on it because she was about to put it in the safe before the robbery.  The bill was not seized by police and was not introduced at trial.

A.O. returned to the store about a week later.  N.C. remembered that A.O. had spent the money with the writing on it.  She also remembered seeing A.O. together with Brown.  It was "like a puzzle getting together more."  N.C. called police and said that A.O.'s boyfriend was the robber.

At trial, N.C. identified Brown as the robber.  She testified that A.O. and Brown were regular customers.  She testified that during the robbery, she recognized Brown's voice and the way he walked.  She was "pretty sure" then she knew who he was.

*Bank robbery*

Twelve days after the gas station robbery, Brown entered a Rabobank in Santa Barbara wearing a baseball cap, a grey sweatshirt with the hood over his head, sunglasses, and black gloves.  Teller G.D. was immediately suspicious because it was not a cold day and the clothing was unusual.

Brown took a deposit slip and wrote on it, "Give me the money[.]  No one gets hurt[.]  Act stupid you die."  He went to the teller window and set down the note.  G.D. put about $4,000 in currency on the counter.  Brown asked if there was a dye pack,

and G.D. assured him there was not.  He put the money under his sweatshirt and walked out of the bank.

Officer Richard Washington saw Brown a few blocks from the bank and noted his scruffy red beard, which matched the description of the robber provided by the bank.  Brown was holding a bag containing a hoodie and hat that closely resembled those worn by the robber in a photograph transmitted by the bank.

Washington had Brown sit on the curb.  When Washington radioed for backup, Brown stood up and ran.  Washington caught Brown and tackled him.  Brown got up and continued running.  Washington tackled him a second time.  Brown got up again, grabbed the officer's helmet, and wrenched his head back and to the right.  Washington subdued Brown with the help of a citizen.

Washington suffered lacerations to his face and elbow and abrasions to his hand.  His uniform was ripped and his motorcycle helmet was broken.

Sergeant Brian Larson, who was investigating the gas station robbery, went to the location where Brown was apprehended.  Larson knew Brown.  He knew Brown and A.O. were in a committed relationship, and were living together near the USA Gasoline station and Rabobank.

A.O. was standing nearby.  Larson arrested A.O. because he suspected she may have been involved in both robberies and possessed money stolen from the gas station.  She was evasive about Brown and her whereabouts that morning.  She denied using stolen money at the gas station.

Officers found a bundle of money in Brown's underwear.  Together with some money in his pants pocket, they inventoried $3,530.

*First interrogation*

Larson contacted Brown at the scene and told him A.O. had been arrested.  Brown asked "for what," and said "there's no reason for her to get arrested."  Larson said, "I kinda agree with you," and "I don't want her to get arrested."  He asked, "Can we talk about that?"  Brown agreed.  Larson said, "she could potentially . . . get unarrested."  Larson said he wanted to "talk about your relationship and how we can maybe get [A.O.] out of trouble."  Brown was advised of his *Miranda*[2] rights.

Brown confessed to the Rabobank robbery.  He described handing the teller the note.  He said A.O. had no idea about the robbery.  He said he called her after being stopped by Officer Washington and told her he robbed a bank, they caught him, and he was going to jail.

Brown denied committing the gas station robbery.  Larson said someone identified Brown as the robber, and said A.O. came in later with some of the stolen money.  Brown denied A.O. was involved in any robbery he had ever done.  Larson said, "maybe she's an innocent . . . Maybe she ends up going today."  "[B]ut to make her innocent in the eyes of the law I need to solve my case and show . . . she wasn't the one who did it."  Brown responded, "okay if you need me to solve that case I'll solve that case for you right here, yeah."  He added, "She didn't have nothing to do with no robbery.  If you need me to clear up some robberies for you I'll do that and shit too."

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

Brown said he stole "a hundred and some bucks." He spent the money immediately to buy drugs from a drug dealer. If A.O. received any of the stolen money, it was an "accident." Larson said, "so you did this thing at the gas station." Brown replied, "If you need me to admit to that fine I'll admit to that dude 'cause that's what happened dude." Larson replied, "I don't want you to admit to anything . . . I want you to tell me the truth." Brown responded, "That's the truth. That's what happened. She didn't have nothin' to do with nothin'." "I did rob the gas station and yes I robbed the bank."

*Second interrogation*

Larson arrested Brown and took him to the police station. Brown acknowledged his *Miranda* rights. He repeated his confession of both robberies and provided details.

Brown admitted changing his clothes after the bank robbery and putting his other clothing into the bag. He admitted running from Officer Washington but denied punching him or doing anything other than possibly pushing back.

Brown admitted robbing the USA Gasoline station. He said he was high on cocaine. He was having a panic attack and he needed drugs to cope with it. He felt bad because he frequently went into the store and the clerk was nice. He said the mask was "just a . . . black piece of clothing." He said he held a kitchen knife and he discarded it as he ran away. Without being asked about A.O., he reiterated that she had not been involved in either robbery and did not have advance knowledge of them.

Brown said he could not keep a job because he had mental issues and posttraumatic stress disorder (PTSD). Since

he was shot a year earlier, whenever he tried to sleep, he would wake up sweaty and fearful.

*Defendant's trial testimony*

Brown testified that a year before the robberies, he was ambushed by two men. Hospital records showed he suffered serious permanent injuries consistent with being shot twice with an assault rifle and stabbed twice with a machete. Brown testified that after his discharge, he suffered from physical pain, weakness, nerve damage, recurring fear he was being attacked, and memory problems. He "tried to never sleep" because he would have nightmares and flashbacks of his attack.

Brown testified that he often wore hats and hoodies to hide from people trying to kill him. He sometimes wore gloves because of nerve damage to his hands.

On the day of the bank robbery, Brown had $30 in his pocket to buy prescription medication. He believed he began experiencing a blackout between 3:30 and 6:30 a.m. He stood in front of the drug store, then went into Rabobank across the street. He wrote the note, gave it to the teller, and robbed the bank. He said he had an out-of-body experience in the bank and returned to normal after exiting.

Brown denied committing the gas station robbery. He visited the gas station regularly, and he frequently spoke with the employee. The day of the robbery, A.O. was happy because she found some money between their residence and the gas station. He told Larson he robbed the gas station because he believed if he did so, Larson would let A.O. go.

*Expert testimony*

Dr. Nancy Kaser-Boyd, a clinical and forensic psychologist with extensive experience in PTSD, testified for the

defense. She testified that PTSD is caused by an incident where a person feels they are going to die or sense a threat to their physical integrity. Brown had PTSD, exacerbated by substance abuse. She testified that Brown's behavior during the bank robbery was consistent with a dissociative state. She did not interview Brown about the gas station robbery because he was adamant he did not commit it and confessed only to protect his girlfriend.

In rebuttal, the prosecution called Dr. James Tahmisian, a clinical psychologist with 45 years' experience. He concluded after interviewing Brown that Brown was not in a dissociative state during the bank robbery but demonstrated situational awareness and engaged in goal-directed behavior.

*Sentence*

The court denied Brown's motion to dismiss the strikes. (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 514.) Brown was sentenced to a determinate term of 27 years, consisting of the upper term of three years for the violation of section 69, doubled for the prior strikes (§ 667, subd. (e)(1)), one year for use of a firearm, and five years for each of the serious felony priors for each robbery. He was sentenced to consecutive indeterminate terms of 25 years to life for each of the robberies, for a total of 50 years to life, to follow the determinate term. The court sentenced Brown to 180 days in county jail for the misdemeanor (§ 185, count 4), concurrent, with credit for 180 days served.

DISCUSSION

*Voluntariness of confession*

Involuntary confessions are inadmissible pursuant to the due process clauses of the state and federal constitutions.

8

(*People v. Weaver* (2001) 26 Cal.4th 876, 920.)  The prosecution has the burden to prove the voluntariness of a confession by a preponderance of the evidence.  (*People v. Peoples* (2016) 62 Cal.4th 718, 740.)

After hearing Larson testify and reviewing the audio recording of the first interrogation and the video recording of the second interrogation, the trial court found that Brown did not exhibit signs of impairment from drug use or mental disability from PTSD.  The court ruled the confessions were voluntary and admissible.  Because the interrogations were recorded and the relevant facts are undisputed, we review the voluntariness of the confessions de novo.  (*People v. Peoples*, *supra*, 62 Cal.4th at p. 740.)

A confession may be involuntary if obtained by direct or implied promises.  (*People v. McWhorter* (2009) 47 Cal.4th 318, 347 (*McWhorter*).)  To establish an involuntary confession, there must be a causal link between coercive police activity and the suspect's statement.  (*Ibid.*)  A confession is involuntary if the defendant's will has been overborne, even if the confession is reliable.  (*Jackson v. Denno* (1964) 378 U.S. 368, 384-385.)

An offer of more lenient treatment in exchange for making a statement may render the statement involuntary and inadmissible.  (*People v. Jackson* (1980) 28 Cal.3d 264, 299, overruled on other grounds by *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)  "The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear."  (*Ibid.*)

An involuntary confession may be based on an express or implied promise to release a family member from custody.  (*People v. Trout* (1960) 54 Cal.2d 576, 585, overruled on

other grounds by *People v. Cahill* (1993) 5 Cal.4th 478, 509 & fn. 17.) In *Trout*, an officer told defendant his wife would be released from custody "if it were shown that she was not involved." (*Id*. at p. 584.) Because the officer was seeking a confession from the defendant, "it could have been understood as suggesting that defendant's wife would be released from custody upon his confession." (*Ibid*.) Similarly, in *McWhorter*, the defendant's statements were involuntary and inadmissible after police promised to release the defendant's wife if he gave enough details about the crime.

Here, Sergeant Larson sought a confession to the gas station robbery, and stated that A.O. could not be deemed innocent unless Larson solved the case. Although A.O. and Brown were not married, Larson knew she was his live-in girlfriend in a committed relationship for over a year. (See *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1403 [promises of leniency for defendant's girlfriend].)

Larson clearly implied that to ensure A.O.'s release, Brown needed to admit committing the gas station robbery. Larson said, "she could potentially . . . get unarrested" and he wanted Brown to talk about "how we can maybe get [A.O.] out of trouble." Throughout the interrogation Brown asserted A.O.'s innocence. Larson responded, "but to make her innocent in the eyes of the law I need to solve my case and show . . . she wasn't the one who did it." This statement reversed the burden of proof and implied that Brown could secure her release by admitting he robbed the gas station. He responded by admitting to the gas station robbery and offered to "clear up" additional robberies. We conclude that the implied promise to release A.O. if Brown

10

confessed rendered the confession to robbing the gas station involuntary and inadmissible.

The second interrogation occurred at the police station about an hour after the first. Although Brown continued to assert A.O.'s innocence, she was not released until after the second interrogation was concluded. The confession to the gas station robbery in the second interrogation was thus involuntary because there was no "'intervening independent act by the defendant or a third party' to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality." (*McWhorter*, *supra*, 47 Cal.4th at p. 360.)

Because the gas station robbery confession was involuntary, the conviction must be reversed unless it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *Arizona v. Fulminante* (1991) 499 U.S. 279, 296.) "The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.' [Citation.]" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) The issue is not whether the evidence without the error would have been sufficient for a reasonable jury, but whether the basis on which "'the jury actually rested its verdict'" was "surely unattributable to the error." (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

Without the confession, it is not clear the jury would have found Brown guilty of robbing the gas station. N.C. identified Brown at trial even though the robber's face was covered with only his eyes visible. N.C. testified she recognized Brown as a customer and recognized his voice and the way he

11

walked. But she initially told police the robber was not a customer and she did not recognize him. The morning of the robbery, A.O. spent a bill that N.C. said she recognized, but it was not produced at trial. N.C. did not make a connection between A.O. and Brown until a week later. Because we cannot conclude that the jury did not rely on the confession in reaching its verdicts relating to the gas station robbery, the error in admitting the confession was not harmless. But because the evidence without the confession would have been sufficient for a rational trier of fact to find Brown guilty, he may be retried for counts 2 and 4. (*People v. Morgan* (2007) 42 Cal.4th 593, 613 [erroneous jury instructions]; *People v. Cooper* (2007) 149 Cal.App.4th 500, 522-523 [erroneous admission of accomplice's statement].)

Brown does not challenge the voluntariness of his confession to the bank robbery. But he contends the admission of his involuntary confession to the gas station robbery prejudiced him as to the bank robbery because it made it more likely the jury would find he robbed the bank intentionally, and less likely it would accept that he was in a dissociative state. We conclude that the error in admitting the confession was harmless beyond a reasonable doubt as to the bank robbery committed twelve days later. His purposeful conduct in the bank, including asking about a dye pack and concealing the money under his clothing, showed situational awareness and goal-directed behavior inconsistent with a dissociative state.

*Expert opinion evidence*

Brown contends the trial court erred in permitting rebuttal testimony by Dr. Tahmisian, and erred when it "implicitly denied the request to strike the rebuttal testimony."

Brown forfeited this issue.  (Evid. Code, § 353; *People v. Dowl* (2013) 57 Cal.4th 1079, 1087.)  A single sentence in a pretrial motion in limine requested a hearing to establish the expertise and relevance of psychological opinions by a prosecution expert.  (Evid. Code, § 402.)  The court reviewed the qualifications of the defense and prosecution experts, and concluded they both had sufficient qualifications to testify.  The defense said nothing further about Dr. Tahmisian's qualifications before he took the stand.

Nor did the defense move to strike Dr. Tahmisian's testimony.  The record shows only that after both sides had rested, during settlement of jury instructions regarding expert testimony, counsel said, "I'd ask that those comments . . . about Post Traumatic Stress Disorder be disallowed."  This untimely and ambiguous comment did not preserve the issue for appeal.

Even if the defense had objected, Dr. Tahmisian had extensive training and experience as a psychologist, and the trial court properly exercised its broad discretion to permit him to testify as an expert.  (*People v. Jones* (2013) 57 Cal.4th 899, 949.)  "[Q]uestions about the depth or scope of his . . . knowledge or experience go to the weight, not the admissibility, of the witness's testimony."  (*Id*. at pp. 949-950.)

Brown also contends the court erred in refusing pinpoint jury instructions.  The defense requested an instruction that if the jury did not believe Dr. Tahmisian was qualified to give an opinion on PTSD, it should consider disregarding his comments and opinions on that subject, and that the jury should disregard his opinion regarding specific intent because that was

13

an issue for the jury.  The court denied the request.[3]

   "The jury must be instructed on general principles ""closely and openly connected to the facts and that are necessary for the jury's understanding of the case"" including those instructions that 'pinpoint' a defense theory.  [Citation.]  Pinpoint instructions are not warranted, however, when they are argumentative, such as when requested only to highlight particular evidence.  [Citation.]  Pinpoint instructions may also be refused if, among other reasons, the proposed instruction is duplicative."  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 498-499.)  We independently review whether jury instructions correctly state the law.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

   The jury instructions given were correct and sufficient.  The court instructed that the prosecution must prove beyond a reasonable doubt that the defendant acted with the required intent and mental state.  (CALCRIM No. 225, modified.) It further instructed that the jury was not required to accept expert testimony as true or correct, that it must "consider the expert's knowledge, skill, experience, training, and education," and that it "may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.  [¶] If the expert witnesses disagreed with one another, you should weigh each opinion against the others. . . . You may also compare the experts' qualifications."  (CALCRIM No. 332.)

---

[3] The record does not include a proposed written special instruction regarding expert testimony.  Brown refers to it as "defense counsel's thinking-out-loud proposed pinpoint instruction."

In light of the defense's extensive cross-examination regarding Dr. Tahmisian's opinions and his limited training regarding PTSD, and closing argument urging the jury to disregard his opinions, the instructions given were sufficient for the jury to evaluate his testimony.

*Cumulative prejudice*

Brown asserts cumulative prejudice, i.e., that "the aggregate prejudicial effect of . . . errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal.4th 800, 845.) In light of our conclusion that the gas station robbery and mask convictions (counts 2 and 4) must be reversed based on the involuntary confession, it is unnecessary to determine whether a combination of other errors would also warrant reversal.

As to counts 1 and 3, any error in admitting the confession to the gas station robbery was harmless. The jury might have acquitted him of bank robbery if it believed he was in a dissociative state. But Brown forfeited a challenge to Dr. Tahmisian's testimony and has not shown that its admission was erroneous. As to the resisting charge, the evidence did not establish that Brown was in a dissociative state after "coming back into [himself]" when he left the bank. We conclude that Brown's guilt "was fairly adjudicated" as to counts 1 and 3 and no cumulative error has been shown. (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.)

*Mental health diversion*

On June 27, 2018, the Governor signed Assembly Bill No. 1810 (2017-2018 Reg. Sess.), providing for diversion of individuals with mental disorders. (§§ 1001.35, 1001.36, enacted by Stats. 2018, ch. 34, § 24.) The legislation took effect the same

day.  (Stats. 2018, ch. 34, § 37.)  It provides that the court may divert from prosecution a defendant who "suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to . . . post-traumatic stress disorder" that "was a significant factor in the commission of the charged offense" and that "would respond to mental health treatment," if "[t]he court is satisfied that the defendant will not pose an unreasonable risk of danger to public safety."  (§ 1001.36, subd. (b)(1).)

Brown was sentenced five days after the legislation went into effect.  The mental health diversion statute is retroactive to cases not final on appeal, including cases where the defendant has been tried and sentenced.  (*People v. Frahs* (2020) 9 Cal.5th 618, 640 (*Frahs*).)

There was evidence that Brown suffered from PTSD and substance-related and addictive disorders.  (Diagnostic and Statistical Manual of Mental Disorders: DSM-5 (5th ed. 2013), pp. 271-280, 481-589.)  We remand for consideration of diversion because "the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder."  (*Frahs, supra*, 9 Cal.5th at p. 640.)

We conditionally reverse counts 1 and 3 pending resolution of the diversion issue.  As in *Frahs*, "[w]e express no view regarding whether defendant will be able to show eligibility on remand or whether the trial court should exercise its discretion to grant diversion if it finds him eligible."  (*Frahs, supra*, 9 Cal.5th at p. 625.)

16

*Serious felony priors*

At the time of sentencing, sections 667, subdivision (a), and 1385, subdivision (b), prohibited the court from striking an enhancement for a prior serious felony conviction.  (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1560-1561.)  These sections were amended effective January 1, 2019, to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes.  (Stats. 2018, ch. 1013, §§ 1-2 (SB 1393).)  This legislation is retroactive here because the case is not final on appeal.  (*People v. Stamps* (2020) 9 Cal.5th 685, 699.)

"Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so."  (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)  The trial court here did not so indicate.  Instead, it correctly noted that it was compelled by *People v. Williams* (2004) 34 Cal.4th 397, 405, to impose two five-year enhancements to each of the 25-year-to-life terms.  "[S]peculation about what a trial court might do on remand is not 'clearly indicated' by considering only the original sentence."  (*Almanza*, at pp. 1110-1111.)  Accordingly, we remand for the trial court to exercise its discretion pursuant to Senate Bill No. 1393 to determine whether to strike the priors pursuant to section 667, subdivision (a).

*Misdemeanor sentence*

The Attorney General concedes that the punishment for count 4 should be stayed because "section 654 precludes punishment under both sections 185 and 211 for his wearing a disguise during . . . robberies."  (*People v. Sering* (1991) 232 Cal.App.3d 677, 681-682, fn. 2 [accepting concession by Attorney

17

General], overruled on other grounds in *People v. Posey*, *supra*, 32 Cal.4th at pp. 205, 215 & fn. 5.) Wearing a mask and robbing the gas station were indivisible parts of one course of conduct incident to one objective. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Although our reversal of counts 2 and 4 renders this issue moot, the sentence for count 4 must be stayed should Brown be convicted of counts 2 and 4 after remand.

DISPOSITION

Counts 2 and 4 are reversed. Counts 1 and 3 are conditionally reversed. The case is remanded to the superior court with directions to conduct a diversion eligibility hearing as to all counts no later than 90 days from the filing of the remittitur. If the trial court determines that Brown qualifies for diversion pursuant to section 1001.36, the court may grant diversion. If Brown successfully completes diversion, the trial court shall dismiss the charges. If the court determines that Brown is ineligible for diversion, or he does not successfully complete diversion: (1) he may be retried for counts 2 and 4 and the deadly weapon enhancement, (2) the conviction for counts 1 and 3 and the admission of the prior serious felony convictions and prior strikes shall be reinstated, (3) he shall be resentenced, and (4) the court shall exercise its discretion whether to strike the serious felony priors.

NOT TO BE PUBLISHED.

TANGEMAN, J.

We concur:

GILBERT, P. J.          PERREN, J.

James E. Herman, Judge

Superior Court County of Santa Barbara

_____

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.