GILBERT, P. J.
*1105 When the retroactive application of a statute gives a trial court discretion to reconsider imposing a lower sentence than one previously imposed, it is the usual custom for an appellate court to remand the case to the trial court. In this opinion on rehearing, People v. McDaniels (2018) 22 Cal.App.5th 420, 231 Cal.Rptr.3d 443 persuades us to follow that custom here.
A jury convicted Christian Almanza of first degree murder ( Pen. Code, §§ 187, subd. (a), 189 )[1] and assault with a firearm (§ 245, subd. (b) ). The jury found gang enhancement allegations true on both counts. (§ 186.22, subd. (b)(1)(C).) On the murder charge, the jury found a principal personally and intentionally discharged a firearm causing death. (§ 12022.53, subd. (d).)
*1106 The trial court found Almanza suffered two prior strike convictions within the meaning of the three strikes law (§ 667, subds. (a)-(i) ) and one prior prison term (§ 667.5, subd. (b) ).
The trial court sentenced Almanza to an aggregate term of 137 years to life, including 25 years to life for the firearm enhancement imposed pursuant to section 12022.53, subdivision (d). The court stayed two other firearm enhancements *192 (§ 12022.53, subd. (b) & (c) ) pursuant to section 654.
Our Supreme Court granted review of our opinion affirming the judgment ( People v. Almanza (Sept. 12, 2017, B270903) 2017 WL 4003064 [nonpub. opn.] ) and remanded the matter to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill No. 620. (People v. Almanza (Nov. 29, 2017, S244789).)
We remand so that the trial court may exercise its independent discretion on whether to strike or dismiss the firearm enhancement. In all other respects, we affirm.
FACTS
Robert Hernandez and his brother, Jesus, were members of the Big Hazard criminal street gang. Jesus got into a dispute with a Big Hazard "shot-caller," Robert Gonzalez. As a result, Jesus shot and killed Gonzalez. The Big Hazard leadership gave a "green light" to kill Jesus and members of his family, including Hernandez. A Big Hazard member who fails to carry out a green light is subject to discipline for failure to follow orders.
Almanza was a Big Hazard gang member. On May 3, 2014, he was at a barbeque attended by other members of his gang. Hernandez and Anthony Rivas were at the barbeque. Almanza gave Hernandez money to buy beer and Hernandez left for the store. While Hernandez was gone, Almanza received a phone call from gang leader Victor "Grizzly" Barrios, advising him that Hernandez was in trouble with the gang. Barrios said that Hernandez had pulled a gun on another Big Hazard member for writing graffiti on a wall.
Almanza and Rivas left the barbeque to confront Hernandez at the store. On the way, they stopped by Rivas's house and picked up a .38 handgun. When they arrived at the store, Almanza went inside to see if Hernandez was there. Almanza saw Hernandez and spoke to him briefly. Almanza left the store with Hernandez behind him. When Hernandez came into the store's parking lot, Rivas shot Hernandez twice, killing him. A bystander, Americo Beltran, was struck in the thigh by a stray bullet.
*1107 Rivas gave the gun to Almanza. Almanza took the gun to another gang member's house where he left it.
Surveillance Videos
Surveillance cameras in and outside the store captured the following:
Almanza and Rivas were walking toward the store. Rivas was several seconds behind Almanza. Rivas appeared to be holding a shiny object in his hand.
Almanza approached the entrance to the store and looked around before entering. He spoke briefly with Hernandez in the store. Almanza walked out of the store with Hernandez immediately behind him.
In the meantime, Rivas entered the store's parking lot. Rivas made a gesture with his hand that Officer Alejandro Feria opined was consistent with someone racking a handgun, but a handgun could not be discerned from the video. Rivas stepped out of the video before the shots were fired. Hernandez fell to the ground. Almanza ran away from the store with a shiny object in his hand.
Cell Phone Texts
On May 3, between 11:02 p.m. and 11:44 p.m., Almanza made outgoing calls to Barrios, the gang leader who warned him about Hernandez.
On May 4, starting at 12:36 a.m., Almanza received text messages stating: "Oh my God. Why? You are so dumb. Leave. Hide. Are you okay? Where are you?" Almanza *193 responded, "I just hope they don't have me on camera" and "I'm sorry Gorda."
At 3:49 a.m., Almanza sent a text message, "I'm good so far, but if I do get busted, tell Diana." Later Almanza texted, "I fudge [sic ] up. And what can I do? Just hope everything goes good." At 6:32 a.m., Almanza texted the same person, "Still here .... Me and [Rivas] drinking. LOL." The person responded, "It's going to get hot out there, babe."
At 1:11 p.m., Almanza texted, "Babe, just got a call. The video blank. They didn't see me. Thank God." Six minutes later Almanza texted, "Gorda. The video at the store was blank. I'm okay. I'm not on it. Thank God."
On May 11, at 9:58 a.m., Almanza texted, "I did some shit that I got to get out of here. I'm just waiting to do one big transa [sic ] and I'm gone." Two *1108 minutes later Almanza texted, "Nobody knows I'm leaving for good, but I'm just gonna ask you once. You wanna leave with me, but nobody could know. R-E-A I'm serious."
Gang Testimony
Los Angeles Police Officer Brian Cook testified as a gang expert. The Big Hazard and the Krazy Ass Mexican gangs were his primary responsibility. The Big Hazard gang has approximately 360 members. Cook has met more than 80 of them.
Big Hazard's primary activities include murder, attempted murder, voluntary manslaughter, assault with deadly weapons, robbery, burglary, felony vandalism and criminal threats. The gang also is involved in narcotics sales.
Cook testified that Rivas is a Big Hazard gang member. Cook has not personally met Rivas. But Cook identified Big Hazard gang tattoos in a photograph of Rivas.
Cook testified that Almanza is also a gang member. Cook has had numerous personal contacts with Almanza. Almanza admitted to Cook that he is a Big Hazard gang member. He has gang tattoos.
Cook testified that Hernandez was a member of the Big Hazard gang. Cook did not know Hernandez personally, but saw his body at the crime scene. Hernandez's body had Big Hazard tattoos.
The prosecution gave Cook a hypothetical based on the facts of the case. Cook opined the shooting was done for the benefit of, at the direction of, or in association with a criminal street gang.
The prosecution introduced evidence of three predicate offenses.
A certified court docket showed Ryan Zepeda was convicted of two counts of attempted murder with a gang enhancement. Cook testified he had numerous personal interactions with Zepeda during which he admitted his membership in the Big Hazard gang.
Hernandez's brother, Jesus, was convicted of the murder of Robert Gonzalez, the murder that led to the Hernandez family being "green lighted." Cook's knowledge of the murder was based on investigative reports and discussions with the investigator and prosecutor.
*1109 Cook testified he personally knew Victor Barrios and knew him to be a member of the Big Hazard gang. Later in the trial Detective Miguel Barajas testified that he served a search warrant on Barrios's residence. He found narcotics, a scale, pay and owe sheets and gang paraphernalia. Barrios was convicted of possession of narcotics for sale.
Confession
After the shooting, Almanza voluntarily went to the police station. He was advised of his rights and agreed to talk to the police. The interview was recorded. After *194 giving three false statements, Almanza admitted to his involvement in the murder.
DISCUSSION
[[/]]**
V
On October 11, 2017, the Governor signed Senate Bill No. 620 into law, effective January 1, 2018. The bill amends subdivision (h) of section 12022.53. The amended subdivision provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.)
The People concede that Senate Bill No. 620 is a statute that gives the trial court discretion to impose a lower sentence and applies retroactively. ( People v. Francis (1969) 71 Cal.2d 66, 75-76, 75 Cal.Rptr. 199, 450 P.2d 591.) The People argue, however, that remand to the trial court is not appropriate under the facts of this case because the record shows the trial court "would not ... have exercised its discretion to lessen the sentence." ( People v. Gutierrez (1996) 48 Cal.App.4th 1894, 1896, 56 Cal.Rptr.2d 529.)
The People point out that the trial court could have imposed concurrent sentences for murder and assault with a firearm. Instead, the court imposed *1110 consecutive sentences. Thus, the People conclude the court exhibited no desire to be lenient with Almanza.
Conflicts in the proper application of the law among different courts of appeal may cause uncertainty and doubt for attorneys, their clients and the public. Often these conflicts require resolution by our Supreme Court. But courts of appeal also enlighten one another in developing the law. Our opinion on rehearing offers such an example and the resolution of what could have been a conflict in the law.
In an earlier version of Almanza , we affirmed and did not remand to the trial court, so that it could decide whether to strike the enhancement. We reasoned that in light of Almanza's crime of premeditated murder, his record, and his sentence, it would be an idle act to afford the trial court the opportunity to reconsider its sentence.
Shortly after publication of our opinion, our colleagues in the Third District in People v. McDaniels , supra , 22 Cal.App.5th 420, 231 Cal.Rptr.3d 443 concluded we applied what amounted to an abuse of discretion standard in our decision not to remand, citing People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243, and People v. Scott (1994) 9 Cal.4th 331, 355, 36 Cal.Rptr.2d 627, 885 P.2d 1040. Remand is not necessary when it is not reasonably probable that a more favorable sentence would be applied in the absence of error.
The persuasive reasoning in McDaniels prompted us to grant rehearing and request further briefing on the appropriate standard of review. Both the People and defense offered excellent arguments on why remand would or would not be appropriate in this case.
The McDaniels court and now we agree on what is the appropriate standard to adopt when a trial court is unaware it has the discretion to reduce a sentence. Remand is required unless the record reveals a clear indication that the trial court *195 would not have reduced the sentence even if at the time of sentencing it had the discretion to do so. (See People v. Gutierrez , supra , 48 Cal.App.4th 1894, 56 Cal.Rptr.2d 529.) Without such a clear indication of a trial court's intent, remand is required when the trial court is unaware of its sentencing choices.
In light of the trial court's initial sentence, choosing consecutive sentences instead of concurrent sentences for murder and assault with a firearm, the People argue that the court "clearly indicated" it chose the firearm enhancement to achieve its desired sentence.
We are persuaded, however, by McDaniels and defense counsel that speculation about what a trial court might do on remand is not "clearly *1111 indicated" by considering only the original sentence. This is the case when there is a retroactive change in the law subsequent to the date of the original sentence that allows the trial court to exercise discretion it did not have at the time of sentence.
We trust the trial court will not be influenced by our previous opinion. We remand so that the trial court may exercise its independent discretion on whether to strike or dismiss the firearm enhancement. (§ 12022.53, subd. (h).) In all other respects, we affirm.
We concur:
YEGAN, J.
TANGEMAN, J.

All statutory references are to the Penal Code.

See footnote *, ante .