Filed 12/11/20  P. v. West CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KENNETH JAMES WEST,<br><br>    Defendant and Appellant. | F077999<br><br>(Super. Ct. No. F15904838)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Kenneth James West repeatedly committed lewd acts against three boys from his large group of extended family and friends over the course of approximately 20 years.

A jury found defendant guilty of two counts of committing a lewd act against R.[1] while R. was under the age of 14 (Pen. Code, § 288, subd. (a);[2] counts 1-2); six counts of committing a lewd act against T. while T. was under the age of 14 (§ 288, subd. (a); counts 4-9); three counts of committing a lewd act against C. while C. was under the age of 14 (§ 288, subd. (a); counts 10-12); and two counts of committing a lewd act against C. while C. was 14 or 15 years of age and defendant was at least 10 years older than him (§ 288, subd. (c)(1); counts 15-16).[3]  As to counts 1, 2, and 4 through 12, the jury found defendant committed the offenses against multiple victims.  (Former § 667.61, subd. (e).)

The court imposed sentences of 15 years to life on each of counts 1, 2, and 4 through 12, to be served consecutively, and concurrent terms of one year each on counts 15 and 16.  Defendant was sentenced to an aggregate term of 165 years to life.

On appeal, defendant contends his sentences of 15 years to life on counts 1 and 2, imposed pursuant to the "One Strike Law," violate the ex post facto clauses of the United States and California Constitutions because there was some evidence to suggest the offenses may have been committed in the five months before the One Strike Law went into effect.  He also contends the trial court failed to recognize it had discretion to impose

---

[1]     Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

[2]     Subsequent statutory references are to the Penal Code.

[3]     As to counts 1, 2, and 4 through 9, the jury found an exception to the statute of limitations.  (§ 803, subd. (f).)

The charges in counts 3, 13 and 14 were dismissed on motion by the People.

concurrent sentences on count 2 and counts 4 through 12, and thus the matter must be remanded to permit the court to exercise its informed discretion.

We find the evidence establishes the offenses alleged in counts 1 and 2 occurred after the effective date of the One Strike Law. We accordingly find no ex post facto violation. We further find that the court understood its discretionary sentencing authority and, even if it did not, its sentencing findings clearly indicate it would not have imposed concurrent sentences on count 2 or counts 4 through 12. Accordingly, we affirm.

## FACTS

Around the mid- to late-1990's, defendant lived off-and-on in a house in Squaw Valley with two brothers, Darrell and George. Sometime between 1994 and 1996, defendant's girlfriend Gina moved into the house with her three children, including R. In approximately 1997, Darrell's girlfriend Ethel moved into the house with her two children, Melissa and T.[4] Soon thereafter, Gina and her children moved out and left the area, and defendant began dating, and eventually married, Ethel's sister Charlene. The families later moved into separate households but regularly spent time together. In 1999, Melissa's son C. was born.

On March 14 or 15, 2015, the families held a gathering at Ethel's house. While there, T. noticed that defendant and C. were absent for approximately 30 minutes. T. eventually saw defendant and C. walking up to the house from a camper parked at the end of the property's long driveway. Because T. himself had been sexually abused by defendant under similar circumstances, he grew suspicious that defendant also was abusing C. A few days later, T. revealed his own history of abuse to his mother and his sister Melissa, although he did not disclose any details. Melissa then confronted her son C., who also acknowledged being abused by defendant, again without disclosing any

---

[4]     Darrell and Ethel eventually married and had another child. They remained married at the time of trial.

3.

details.  Family members eventually contacted Gina, who confronted R.  R. acknowledged he too was abused, but did not disclose details to Gina.

Each of the victims testified that, prior to these revelations, they had not discussed the abuse with anyone, and they only provided details of the encounters to sheriff's deputies and in their trial testimony.

## I.     R.'s Testimony

When R. was around eight years old,[5] his mother began dating defendant.  At that time, R.'s father was in prison, and R. had not seen his father for six or seven years. Defendant took R. fishing, shooting, and camping.  One day, while defendant and R. were together in defendant's vehicle, defendant offered to pay R. $100 if R. would take off his clothes and run through an orchard.  R. thought this was a joke and did not do it.

R. and his mother and sisters eventually moved into the house defendant shared with Darrell and George in Squaw Valley.  On one occasion thereafter, defendant and R. went on a hike.  When they stopped on the trail and sat down, defendant asked R. if he knew how to masturbate and whether he could ejaculate.  R. explained that "it was worded . . . kind of like . . . that's what dads showed their boys was how to pleasure themselves."  Defendant touched R.'s penis and said, "This is how you do it."  Defendant eventually stopped and told R., "What goes on between us, you know, you can't tell your mom or anybody."  The incident lasted 10 to 15 minutes.

Another incident occurred one to two weeks later.  By that time, defendant and R.'s family had moved together to another home in Squaw Valley.  R. and defendant were home by themselves when defendant came into R.'s room wearing only a shirt and underwear and told R. he wanted to show him "how to do some more stuff."  Defendant sat down on R.'s bed and started touching R. under his clothes, and had R. touch him

---

[5]     R. was born in June of 1986.  He was 31 years old at the time of trial.

under his clothes. Defendant then orally copulated R. and had R. orally copulate him. Eventually, defendant stopped and told R. not to tell.

R. testified generally that at least 10 additional incidents of masturbation or oral copulation occurred over the course of one to two years. In one incident, defendant took R. and his older cousin fishing and, on the trip, masturbated the boys and had them masturbate themselves. Incidents involving R.'s cousin occurred on two or three occasions. Defendant also smoked marijuana with R. on one occasion and regularly gave R. beer at times when sexual incidents occurred.

Eventually, defendant and R.'s mother split up and R. and his family moved out of California.

## II.     T.'s Testimony

T. was nine years old when his parents divorced and he, his mother Ethel, and his sister Melissa moved in with Darrell in Squaw Valley.[6] Also living in the home were Darrell's brother George, defendant, defendant's girlfriend Gina, and Gina's children, including R. Eventually, however, George moved out, as did Gina and her children. Defendant began dating T.'s aunt Charlene, who also moved into the house.

When T. and his family first moved in with Darrell, T. did not know Darrell and his mother were dating. When T. found out about the relationship, he was upset and defendant talked T. into going for a walk to calm down. Defendant then said something that made T. uncomfortable and touched T.'s thigh. On that occasion, nothing further occurred. Thereafter, T.'s relationship with Darrell was "a little closed off" and T. had animosity toward Darrell for being with his mother.[7] T. had a relationship with his father but did not see him often. Defendant would regularly intervene when something was

---

[6]     T. was born in May of 1988. He was 30 years old at the time of trial.

[7]     By the time of trial, however, T. acknowledged that Darrell was good to him and was a good guy.

bothering T. and would suggest they take a walk. Often, this behavior was encouraged by other adults in the household.

As defendant continued to take T. on outings, the touching progressed. On the next two to three outings, defendant touched only T.'s thigh. On the third or fourth encounter, defendant touched T.'s penis over his clothes and asked whether he liked it. In future encounters, defendant touched T. under his clothes. On approximately five to 10 subsequent occasions, defendant only touched T.'s penis with his hand. Defendant would masturbate T. until he ejaculated. Eventually, defendant asked T. to masturbate him. This occurred on 50 to 75 separate occasions. Later, when T. was 10 years old, defendant orally copulated him, and eventually had T. orally copulate defendant as well.

During the period that T. lived with defendant, the sexual acts described by T. occurred a few times each week amounting to hundreds of times. T. testified in specific detail regarding incidents on a trail behind the home and behind a rock on that trail, incidents in defendant's bedroom and bathroom, and an incident that occurred while pulled over on the roadway.

T. and his family moved out of the house when T. was 12 or 13 years old. T. testified that the sexual touching continued to occur thereafter. He testified in specific detail to an incident of masturbation and oral copulation that occurred when defendant visited the family's new home and took T. out to ride three-wheelers on a mountain behind the house. Approximately 100 to 200 incidents occurred on the mountain.

The sexual touching stopped when T. was 14 years old and defendant moved to Nevada. T. visited defendant after the move, but refused to engage in further sexual acts. Defendant returned to Squaw Valley when T. was almost 18 years old but no further sexual touching occurred. T. and defendant pretended that nothing had ever happened and their relationship thereafter was "[p]retty normal."

6.

Around 2015, T. began to suspect defendant was sexually touching his nephew C. He noticed on a few occasions when family was gathered that C. and defendant could not be found. The third time this occurred was on March 14 or 15, 2015, when the family was gathered at T.'s mother's house in Squaw Valley. On that occasion, defendant and C. were missing for approximately 30 minutes and people began calling out for them. T. saw C. and defendant returning from a camper trailer at the end of the driveway. T. was upset and drank until he passed out. He felt he needed to reveal what defendant had done to him so it would not continue.

A few days later, T. drove to his mother's house, where his family was gathered. T. asked his mother and sister Melissa to go with him for a drive, and told them in general terms what had occurred between himself and defendant. Melissa immediately began "flipping out" about C. When they returned to the house, Melissa immediately left with C. Later, Melissa called T. and confirmed in general terms that C. also had been abused by defendant. T. did not discuss any details of the abuse with C.

### III. C.'s Testimony

C. had known defendant all his life.[8] Defendant would take C. to ride "quads" and they built things, such as a doghouse, together. C. was close with defendant.[9]

C. estimated that defendant touched him sexually around 30 times, from the time C. was eight years old until he was 14 to 16 years old. C. testified in specific detail regarding several incidents, including an incident of oral copulation and masturbation that occurred when C. was eight years old and was out riding quads with defendant, an incident of masturbation that occurred when C. and defendant were riding quads at C.'s grandmother Ethel's house, an incident of oral copulation and masturbation that occurred

---

[8]    C. was born in June of 1999. He was 18 years old at the time of trial.

[9]    C.'s father left when C. was 18 months old and C. thereafter only saw his father three times, the last time being when he was seven years old.

in a camper trailer at Ethel's house, an incident of masturbation in a tool shed at defendant's house, and an incident of masturbation and oral copulation that occurred when C. was staying with defendant for a summer. C. testified that multiple incidents occurred while out riding quads and while in the tool shed at defendant's house. The touching stopped when C. was 14 or 15 and told defendant he did not like the touching.

## IV. Defendant's Admission to His Brother-in-Law

One day in 2015, Ethel called her brother James hysterical and crying and told him that defendant had molested T. and C.[10] James told Ethel to call their sister Charlene, who was also defendant's wife, to tell her what was going on. Charlene then called James and stated that Ethel had reported defendant to the police. Charlene stated, "I can't believe it," and "my life's ruined." James met Charlene in a neighborhood near her house, and she told him that defendant had denied everything. However, while they were talking, Charlene received a phone call from defendant and told James, "He said he did it. He said he did it."

Moments later, defendant called again and James answered. Defendant told James "I molested them boys. I'm sick and I need help." Defendant also told James "I've been doing it for a long time. I'm sick and I need help." James told defendant to turn himself in.

Later that night, defendant texted Charlene and told her he was "getting out of there" because the "cops were coming." James spoke with defendant and told him he needed to come back. A couple of hours later, James and Charlene met defendant in a nearby park. Defendant said he was sick and needed help. Defendant asked how much time James thought defendant would get. After this conversation, Charlene told James she was going to leave defendant but needed to go home to retrieve her belongings.

---

**10** These facts were presented through James's testimony. James also testified that he suffered a prior conviction for attempted murder and served four years in state prison.

Later, she texted James to tell him she was going to stay with defendant to get him help. James did not talk to defendant or Charlene again after that day.

## V. *Expert Testimony*

An expert on Child Sexual Abuse Accommodation Syndrome testified that children who have been sexually abused may keep the abuse a secret and may delay reporting.

## VI. *Defense Case*

Three of defendant's neighbors testified that they knew defendant to be honest and truthful.

Defendant testified on his own behalf. He testified that when Charlene called him in March 2015 and told him of the accusations, he drove home and saw her driving away. He then drove to Reno to try to speak with one of Charlene's sisters, but she was not home. He spent the night in his car. He spoke with his wife again the next day, then returned home and found her there. He denied having any contact with James, by telephone or in person, in relation to the allegations of molestation in this case. He denied meeting with James in a park.

Defendant acknowledged that he took C. and other children to ride on quads in Squaw Valley. He denied having any sexual contact, including physical touching or oral copulation, with R., T., or C.

Defendant testified that he had an altercation with Melissa on March 14, 2015.

## DISCUSSION

## I. Ex Post Facto Challenge

Defendant contends his sentences of 15 years to life on counts 1 and 2, imposed pursuant to section 667.61 (the One Strike Law) violate the ex post facto clauses of the United States and California Constitutions because there was some evidence that could indicate the offenses occurred in the five months before the One Strike Law became effective. We conclude the evidence establishes beyond a reasonable doubt that the

offenses alleged in counts 1 and 2 occurred after the effective date of section 667.61, and so find no ex post facto violation.[11]

### A.  Applicable Law

"Both the California and United States Constitutions proscribe ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)" (*People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1178 (*Alvarez*).)  "A statute violates the prohibition against ex post facto laws if it punishes as a crime an act that was innocent when done or increases the punishment for a crime after it is committed." (*People v. White* (2017) 2 Cal.5th 349, 360; accord, *Collins v. Youngblood* (1990) 497 U.S. 37, 41-42.)

Section 667.61 became effective on November 30, 1994 (*Alvarez*, *supra*, 100 Cal.App.4th at p. 1178) and, at the time relevant here, mandated a sentence of 15 years to life for violations of section 288, subdivision (a), where the defendant was convicted of committing such offenses against more than one victim.  (Former § 667.61, subds. (b), (c)(7), (e)(5); see Stats. 1993-1994, 1st Ex. Sess., ch.14, § 1.)  "The sentences prescribed by section 667.61 greatly exceed the determinate sentences previously available for violations of section 288." (*People v. Hiscox* (2006) 136 Cal.App.4th 253, 257 (*Hiscox*).)  Thus, application of section 667.61 to offenses committed before November 30, 1994, violates the ex post facto clauses of both the California and United States Constitutions. (*Hiscox*, at p. 257; *Alvarez*, at p. 1178.)

To avoid an ex post facto violation, the People must prove to the jury that the defendant committed the offenses on or after November 30, 1994, the effective date of section 667.61.  (*Hiscox*, *supra*, 136 Cal.App.4th at p. 260.)  Where the jury is not asked "to make findings on the time frame within which the offenses were committed, the

---

[11]  The statute has since been amended to require a sentence of 25-years-to-life under such circumstances.  (§ 667.61, subd. (j)(2); Stats. 2010, ch. 219, § 16.)

When we refer to section 667.61, we are referring to the pre-amendment version.

verdicts cannot be deemed sufficient to establish the date of the offenses unless the evidence leaves no reasonable doubt that the underlying charges pertained to events occurring on or after November 30, 1994." (*Id.* at p. 261.) A reviewing court may not "infer that certain acts probably occurred after that date," or "hypothesize . . . what dates might be attached to certain acts based on ambiguous evidence." (*Ibid.*)

## B. Analysis

R. was born on June 29, 1986. He therefore turned eight years old on June 29, 1994, approximately five months prior to the effective date of section 667.61. He testified that defendant first touched him sexually when he was "[a]bout nine years old. Eight, nine years old." The second incident occurred a week or two later. This testimony, standing alone, would leave some doubt as to whether the offenses could have been committed prior to November 30, 1994. However, this is not the only evidence regarding the timing of the incidents.

R. also testified that his mother and defendant were in a relationship for two or three years beginning when R. was "around eight" years old.[12] He explained he was eight or nine when he met defendant at a wedding reception, at which point his mother

---

[12] Defendant repeatedly refers to R.'s estimation that his mother and defendant dated for two to three years, ending when R. was 10, to argue the abuse may have begun when R. was seven. R. clearly testified that defendant and his mother began dating when he was eight years old, and his testimony does not permit an inference that the dating relationship or the abuse occurred when R. was seven years old:

"Q How long were they a couple?

"A About two, three years.

"Q Okay. So, beginning when you were around eight?

"A Yeah.

"Q Or seven, what would you say?

"A I'd say around eight, I think. About that time." (Boldface omitted.)

11.

and defendant were beginning to date. They started officially dating shortly thereafter, and R. and his family moved in with defendant approximately three to four months later. "[A] little bit before" the family moved into defendant's house, when R. was "[p]robably about eight, nine years old," defendant offered R. $100 to run naked through an orchard. The first incident of abuse occurred four to five months later, while R. and his family were living with defendant, and while R. was "[a]bout nine years old. Eight, nine years old." The second incident occurred one to two weeks later. R. and his family moved out of defendant's home when R. was nine or 10 years old.

Even if defendant and R.'s mother began dating on R.'s eighth birthday, the testimony set forth above would not permit an inference that the abuse occurred before November 30, 1994. R. and his family moved in with defendant three to four months after his mother and defendant began dating. The earliest date this could have occurred is September 29, 1994, three months after R.'s eighth birthday. The first incident of abuse occurred four to five months after the incident in which defendant offered R. money to run naked through a field. That incident occurred "a little before" the family moved into the house, making the earliest date of abuse sometime around January 1995, well after the November 30, 1994, effective date of section 667.61.

Other evidence confirms the abuse could not have occurred prior to November 30, 1994. Defendant testified that R. lived with him from 1996 into 1997, and indeed that he himself did not live in that house until 1996 or 1997. Defendant also testified that R. was nine years old at the time they lived together. Defendant's own testimony therefore establishes that the abuse alleged in counts 1 and 2 could not have occurred prior to November 30, 1994. The testimony does not permit any plausible contrary inference.

Finally, we note that count 1 was alleged to have been committed between January 1, 1995, and December 31, 1996. Count 2 was alleged to have been committed between January 1, 1995, and June 28, 1996. The verdict forms likewise asked the jury to determine defendant's guilt based on these dates, and the prosecutor argued the

12.

offenses against R. occurred "as early as 1995." We recognize these facts are not dispositive in light of the jury instruction advising the jury the People were not required to prove the crimes took place within that time frame. Nonetheless, the charges and the verdict forms, along with the state of the evidence, distinguish this case from others in which the Courts of Appeal have been unable to determine beyond a reasonable doubt that particular acts alleged by the People were committed after the effective date of section 667.61. (*People v. Riskin* (2006) 143 Cal.App.4th 234, 244-245 [finding ex post facto violation where the offense was alleged to have occurred between June 15, 1994, and June 14, 1998, and the victim's testimony was inconsistent as to her age at the time the offense was committed]; *Hiscox*, *supra*, 136 Cal.App.4th at pp. 260-262 [finding ex post facto violation where the offenses were alleged to have been committed from 1992 through 1996 and the "generic" witness testimony did not establish the dates the abuse may have occurred].)

Here, the evidence leaves no reasonable doubt the offenses were committed after section 667.61 became effective. (*Hiscox*, *supra*, 136 Cal.App.4th at p. 261.) Accordingly, we find no ex post facto violation.

## II. Imposition of Consecutive Life Sentences

Defendant contends the court was unaware it had discretion to impose concurrent, rather than consecutive life sentences on count 2 and counts 4 through 12. The People do not dispute the trial court had discretion to impose concurrent sentences, but argue the court was aware of that discretion and chose to exercise its discretion to impose consecutive sentences.[13] We conclude the trial court understood its discretionary

---

[13]    The People also contend the issue is forfeited. In light of defendant's claim of ineffective assistance of counsel, we dispose of this issue on the merits. (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14 [rejecting claim of ineffective assistance where claim fails on the merits].)

authority and, in any event, that remand for resentencing would be futile under the facts presented here.

## A.  Additional Factual Background

At sentencing, the court stated, "So, the position by the Probation Department is that this is a 168-year-to-life term with requirements of mandatory consecutive terms with each of the offenses . . . ."[14]  The People stated:

> "And, Your Honor, the People agree with that recommendation.  I think that it's appropriate and believe that [defendant] is exactly the type of defendant [section] 667.61[, subdivision ](j) was intending to punish more severely by being a serial predator, by basically looking for multiple victims and by committing these crimes over a span of several decades. The People believe that the recommendation by Probation is appropriate."

When asked if he had any argument in response, defense counsel replied, "No."

> The court noted:

> "There's evidence from three different complaining witnesses, C[.], R[.] and T[.]  There's also evidence potentially that the Court heard during the course of the trial of yet another young man out there.  Maybe he was not contacted who may have been victimized also.  I understand that [defendant] maintains his innocence in this case and that's with -- well within his rights to do as to fight the charges and maintain that all the way through.  But having said that, I just don't see how and why C[.], R[.] and T[.] would come forward and make this up.  I don't understand that. Probably more telling to the Court is that R[.], somebody who was a child in 1990s and apparently had not much, if any, contact with [defendant] in this case, came forward to testify and corroborated much of what C[.] and T[.] had said and apparently done so without much communication with these individuals.  And it was eery [*sic*] to the Court to hear how it is that he was essentially groomed and approached by [defendant] to become involved in the sexual conduct here.  Also, the evidence was is that the circumstances really wasn't discussed between C[.] and R[.]  In other words -- strike that, T[.]  In other words, there weren't any of the details that were shared, but yet the testimony of each when they testified, the details were eerily similar, such that the Court can only surmise that this is

---

**14**    The probation department recommended consecutive terms, but did not state consecutive terms were mandatory.

the modus operandi or the way that [defendant] operates in grooming children. A very sad case because [defendant], in the Court's estimation, violated a position of trust. [Defendant] doesn't have much criminal history, if any, and I'm mindful of that also. But these offenses as they are charged and as the jury found require imposition of life terms in each of them."

The court went on to note the following factors under rule 4.425(a)(3) of the California Rules of Court as relevant to its decision:

"The Court would note that these offenses were committed at different times or separate places rather than being committed so closely in time so as to indicate a single period of aberrant behavior. Indeed the behavior here, as the Court noted, occurred over the course of some two decades at least. The offenses were alleged and found to have been committed over the period of nearly two decades, as the Court would note and find. And trial evidence supports this finding. The offenses occurred at different locations and at different properties, according to the testimony. And trial evidence supports this finding by the Court, likewise. Under California Rule of Court[,] rule 4.425(b), circumstances in mitigation or aggravation can also be considered in imposing concurrent or consecutive terms. And the Court finds the following aggravating circumstances to impose the consecutive terms. The manner in which the offense occurred involved planning. Indeed the evidence shows a grooming of these children to render them compliant for the deviant sexual acts that were committed on them. The Defendant . . . took advantage of a position of trust and confidence to commit the offenses. The trial evidence showed the Defendant took what appeared to be, to outside observers anyway, a fatherly interest in the children. These boys may not have had a strong father figure in their lives, otherwise, and the Defendant sought to fill that void. He took them to places, he rode quads with them and otherwise befriended them. But this essentially was the manner in which he was able to get access to the children and groom them for purposes of the offenses."

On that basis, the court ordered consecutive terms of 15-years-to-life on counts 1 and 2, and counts 4 through 12. The court continued: "The Court will nonetheless order concurrent low terms of one year for Counts 15 and 16. The concurrent low terms are selected after a consideration of the sole mitigating circumstance in that [defendant] has an insignificant record of criminal conduct."

15.

## B.    Analysis

Subdivision (i) of section 667.61 currently mandates consecutive sentences for certain offenses.  Offenses committed under subdivision (a) of section 288 are not included in this mandatory sentencing provision.  (§ 667.61, subd. (i); see § 667.61, subd. (c)(8); *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262.)  Moreover, the version of section 667.61 in effect at the time the offenses at issue here were committed contains no consecutive sentencing mandate.  (Former § 667.61.)  Nonetheless, the imposition of consecutive terms for offenses committed under subdivision (a) of section 288 remains within the court's discretionary authority.  (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.)  Generally, absent evidence to the contrary, a reviewing court will presume that the trial court " ' "knows and applies the correct statutory and case law." ' " (*People v. Jones* (2017) 3 Cal.5th 583, 616.)  "A court is 'presumed to have been aware of and followed the applicable law' when imposing a sentence." (*People v. Reyes* (2016) 246 Cal.App.4th 62, 82; accord, *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 ["[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion."].)

Here, the trial court initially stated "the position by the Probation Department is that this is a 168-year-to-life term with requirements of mandatory consecutive terms with each of the offenses . . . ."  However, nothing in the probation report suggests consecutive terms were mandatory.  To the contrary, the probation report set forth criteria relevant to the court's discretionary determination of concurrent or consecutive sentences and, based on those criteria, recommended consecutive sentences.  Furthermore, the court's oral imposition of sentence does not suggest the court believed consecutive terms to be mandatory, as the court discussed aggravating factors that supported the imposition of consecutive sentences.  (Cal. Rules of Court, rule 4.425(a)(3).)  The court also

16.

imposed concurrent sentences on counts 15 and 16, and thus clearly understood there was no "requirement[] of mandatory consecutive terms with each of the offenses," despite its earlier statement to the contrary. We therefore are not convinced the court believed consecutive terms were mandatory.

Furthermore, where the court has exercised its sentencing authority without being aware of the scope of its discretionary powers, our Supreme Court has held that "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110 ["Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so."]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [same].) Here, even if the court misunderstood the scope of its discretionary sentencing authority, remand for resentencing in this case would be futile because the court clearly would have imposed the same sentence. The court's discretionary sentencing findings in support of consecutive sentencing eliminate the need for a remand in this case. (*People v. Jones* (2019) 32 Cal.App.5th 267, 274 [remand unnecessary where record is clear the trial court would not exercise discretion to strike enhancement under Sen. Bill No. 1393]; *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [record clear trial court would not exercise discretion to strike enhancement under Sen. Bill No. 620].)

# **DISPOSITION**

The judgment is affirmed.

DETJEN, J.

WE CONCUR:

POOCHIGIAN, Acting P.J.

SMITH, J.

18.