Filed 3/4/22  P. v. Ibe CA1/1
Opinion following rehearing

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANDANNA IBE,<br><br>        Defendant and Appellant. | A159571<br><br>(Alameda County<br>Super. Ct. No. 17-CR-012133B) |

A jury convicted appellant Andanna Ibe of conspiracy to commit murder and attempted murder of a woman and her 11-month-old child.  Ibe argues on appeal that the trial court erred by denying her motion to suppress a statement made in a post-arrest interview.  She claims the statement was obtained in violation of her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Ibe also contends that we should remand for resentencing due to a recent statutory amendment to Penal Code section 654.[1]  The statute previously required an act or omission punishable in different ways by different laws to be punished under the law that provided for the longest potential term of imprisonment.  Assembly Bill No. 518 (2021–2022

---

[1] All further statutory references are to the Penal Code.

Reg. Sess.) (Assembly Bill No. 518) amended section 654 to afford trial courts the discretion to punish the act or omission under any of the applicable laws.

We conclude that there was no *Miranda* violation, but that remand for resentencing is warranted to allow the trial court to exercise its new sentencing discretion under section 654. Accordingly, we remand for resentencing, and in all other respects we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Shooting*

On April 17, 2017, Asala Odom had agreed to meet Marcel Brooks, the father of her 11-month-old son, at a McDonald's restaurant. Odom texted Brooks when she arrived. As she was waiting at a table, Odom heard a "really loud pop, and a flashing." Odom looked up to see a woman running out of the restaurant and a bullet hole in the window next to her. Surveillance video from the McDonald's showed someone walking toward Odom's table, pulling a gun from a purse, firing a single shot, and then exiting the restaurant.

Brooks was located the next morning at a motel with Ibe. Both were arrested.

### B. *The Post-arrest Interview*

Ibe was interviewed by two detectives after her arrest. One of the detectives read the *Miranda* admonishment to Ibe and asked her, "Do you understand these rights?" She responded, "Yeah." Ibe provided various details regarding her relationship with Brooks and told the detectives that Brooks had relationships with two other "baby mamas" besides her. The detective told Ibe that there was a "fourth woman" who Brooks had identified as his girlfriend. When the detective began questioning Ibe as to what had

happened the day before, she invoked her right to counsel. The detectives left the room.

About an hour and 40 minutes later, the detectives walked Brooks over to the interrogation room where Ibe was waiting. While in the doorway, one of the detectives asked Brooks: "Is this who had the gun yesterday?" Brooks responded: "Yes."

About eight minutes later, one of the detectives returned to the interrogation room and stated to Ibe: "Almost done ma'am, I need your shoes, if you wouldn't mind putting them in here. And have they told you what your charges are?" Ibe responded: "Can you close the door and talk please, I'm very, very confused." The detective stated: "Well, unfortunately, you asked for an attorney, so if you want to talk we can, but you're going to have to waive that right." Ibe then asked if Brooks had waived his right, but the detective responded that he could not speak to Ibe unless she waived her right. Ibe stated: "[F]ine, let's do it." When the detective asked if she wanted to think about it, Ibe responded: "No, let's do it, because some things don't make sense." The detective left the room with her shoes.

About five minutes later, both detectives returned. The *Miranda* admonishment was read for the second time and when asked if she understood those rights, Ibe responded: "Yes, I do." One of the detectives then asked Ibe if she wanted to "waive [her] right to have an attorney present" and talk to them "without an attorney?" Ibe responded: "Yeah."

When Ibe began by expressing confusion about the "fourth baby mama," a detective disclosed the name of the woman that Brooks had provided. Ibe then admitted that she had driven with Brooks to the McDonald's and fired the shot. She stated the shooting had been planned for a while, and that Brooks had wanted her to kill Odom's 11-month-old child

3

because Odom was "using the baby to try to kill him and try to take away his life and, um, threatening our son's life too." Ibe also described a previous attempt to execute Brooks' plan: a few weeks before the shooting, Ibe had tried to run Odom over with her car while Odom was crossing the street and carrying her child, but Odom had jumped out of the way.

### C. Ibe's Trial Testimony

Ibe testified at trial that she went to the McDonald's to "size up the competition" and scare Odom "to just only want to have a coparenting relationship with [Brooks] and nothing more." Ibe testified that she had pointed the gun towards the window; she had no intention to kill anyone and had not discussed it with Brooks. As to the previous encounter with Odom in her car, Ibe testified that she went to see Odom and her car served when she was not paying attention, but she claimed she was not trying to hit Odom or her child.

### D. Procedural History

Ibe was charged by amended information with conspiracy to commit premeditated murder of Odom and her child (§§ 182, subd. (a)(1), 187, subd. (a)); two counts of attempted premeditated murder of Odom's child (§§ 187, subd. (a), 664, subd. (a)); and attempted murder of Odom (§§ 187, subd. (a), 664, subd. (a)) with two firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (b)).

Before trial, Ibe moved to suppress her post-arrest interview statement. At the hearing on the motion, one of the interviewing detectives testified that during the interview Ibe had appeared alert, orientated, and of sound mind. The detective testified that Brooks had identified Ibe as the shooter during his own interrogation, but the detectives had asked Brooks to identify her in person for "thoroughness of investigation" and because Ibe had worn a mask

4

during the shooting. The detective also testified that attempting to make co-arrestees believe that one had somehow incriminated the other was a "tool" of the interrogation process. The detective testified that asking suspects, such as Ibe, if they knew what they were being charged with was a "common practice." The interrogation was recorded by video, and the recordings were admitted into evidence.

The trial court denied the motion. Finding the detective to be credible, it concluded that Brooks' "brief dispassionate and factual" doorway identification and the detective's "routine" inquiry as to Ibe's knowledge of the charges did not constitute an interrogation. The trial court also concluded that the second waiver was valid, after noting that Ibe appeared "very calm" and "very articulate" during the interrogation.

The jury found Ibe guilty as charged on all four counts, and found the firearm allegations true. The trial court sentenced Ibe to 25 years to life in prison for conspiracy to commit premeditated murder, and stayed the sentences on the remaining counts and enhancements.

## II. DISCUSSION

### A. Ibe's Motion to Suppress Her Post-Arrest Interview Statement

*Miranda* held that to protect the federal constitutional right against self-incrimination, "any person who is suspected or accused of a crime and who has been taken into custody or otherwise restrained may not be interrogated by the police unless he [or she] first knowingly and intelligently waives his [or her] right to silence, to the presence of an attorney, and to appointed counsel if indigent." (*People v. Ray* (1996) 13 Cal.4th 313, 336.) When the accused has invoked his or her right to counsel, a valid waiver of that right cannot be established unless the accused initiates further communication with the police. (*Oregon v. Bradshaw* (1983) 462 U.S. 1039,

5

1044 (*Bradshaw*).) "Statements obtained in violation of *Miranda* are not admissible to prove the accused's guilt in a criminal prosecution." (*Ray, supra*, 13 Cal.4th at p. 336.) In reviewing *Miranda* claims, we accept the trial court's resolution of disputed facts and evaluations of credibility if supported by substantial evidence (*People v. Enraca* (2012) 53 Cal.4th 735, 753), " 'but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269 (*Gonzales*).)

Here, Ibe argues that her post-arrest interview statement should have been suppressed for three reasons: (1) the detectives improperly reinitiated the interrogation after Ibe invoked her right to counsel; (2) a valid waiver cannot be established because Ibe did not initiate further communication with the detective after the invocation; and (3) Ibe's second waiver, obtained after she told the detective she wanted to talk, was not "knowingly, intelligently, and voluntarily" made. We are not persuaded.

          1.      The detectives did not reinitiate the interrogation.

Ibe first argues that her statement was inadmissible because the detectives improperly reinitiated the interrogation after she invoked her right to counsel. Specifically, she contends that the doorway identification by Brooks and the question to Ibe about whether she had been advised of the charges against her constituted interrogation.

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the

6

suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 (*Innis*).) "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Id.* at p. 301.) In *Innis*, a suspect showed police officers the location of a gun after overhearing their conversation that there was a nearby school for handicapped children and a child might get hurt if he or she found the gun. (*Id.* at p. 295.) The United States Supreme Court concluded that the suspect was not interrogated within the meaning of *Miranda*, as the conversation was "nothing more than a dialogue between the two officers to which no response from the respondent was invited." (*Id.* at p. 302.)

We conclude that the doorway identification here similarly did not constitute an interrogation because no response from Ibe was invited. (*Innis*, *supra*, 446 U.S. at p. 302.) Indeed, the detectives did not even give Ibe an opportunity to respond: they left as soon as Brooks identified her as the woman with the gun. (See *Shedelbower v. Estelle* (9th Cir. 1989) 885 F.2d 570, 574 [explaining that where officers left suspect after he insisted he wanted to talk, "it hardly seems reasonable that the police were eliciting a response from [the suspect]; otherwise, they would have stayed and listened to him confess right then"].) Ibe's reliance on *People v. Fioritto* (1968) 68 Cal.2d 714 is misplaced. In that case, officers confronted the 19-year-old defendant with two of his accomplices who had confessed and implicated the defendant. (*Id.* at pp. 717, 720.) One of the accomplices had a heated argument with the defendant over a small loan. (*Id.* at p. 717.) The defendant was then asked if he wanted to sign a waiver and confess. (*Ibid.*) Nothing of the sort occurred here. The doorway identification by Brooks of Ibe was brief and discrete, and Ibe was not asked or given an opportunity to respond.

As to the detective's question whether Ibe had been informed of her charges, it was a simple booking inquiry "normally attendant to arrest and custody." (*Innis*, *supra*, 446 U.S. at p. 301.) The detective testified that asking the question was a "common practice" when booking a suspect, and the trial court found the detective to be credible. The video recording supports that finding: the detective reentered the room, telling Ibe that they were "[a]lmost done" and needed to collect her shoes before asking her the question. Given this context, the inquiry is reasonably viewed as part of the routine custodial process.

Neither the doorway identification nor the inquiry regarding the charges constituted an "interrogation" under *Miranda*.

        2.     Ibe initiated further communication with the detectives.

Ibe argues that she did not waive her right to counsel by further communicating with the detectives because she "only wanted to know whom Brooks had named as his girlfriend." We disagree.

In *Bradshaw*, the United States Supreme Court concluded that a defendant's statements were admissible where he invoked his right to counsel and later asked a police officer, " 'Well, what is going to happen to me now?' " (*Bradshaw*, *supra*, 462 U.S. at pp. 1041–1042.) Contrasting this question with a routine custodial request for a drink of water or to use the telephone, *Bradshaw* reasoned: "Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation." (*Id.* at pp. 1045–1046.)

So too here. Ibe initiated further communication with the detective by asking him to close the door and talk with her. Her request did not relate to "routine incidents of the custodial relationship," but instead "evinced a willingness and a desire for a generalized discussion about the investigation." (*Bradshaw*, *supra*, 462 U.S. at pp. 1045–1046.) The detective apparently understood the request as such because he immediately reminded Ibe that she had earlier invoked her right to counsel and entered into further discussions only after re-reading the *Miranda* advisement and ensuring that she wanted to waive her right to counsel.

   3. Ibe's second waiver was valid.

Ibe argues that even if she did reinitiate the conversation, her second waiver was not "knowingly, intelligently, and voluntarily" made. Again, we disagree.

" 'In determining the validity of a *Miranda* waiver, courts look to whether it was free from coercion or deception, and whether it was " 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*Gonzales*, *supra*, 54 Cal.4th at p. 1269.) The prosecution bears the burden to establish waiver by a preponderance of the evidence. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 383–384.) The ultimate question is "whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation" (*People v. Cruz* (2008) 44 Cal.4th 636, 668), " 'keeping in mind the particular background, experience[,] and conduct of the accused.' " (*Gonzales*, *supra*, 54 Cal.4th at p. 1269.)

Here, Ibe argues that there was no valid waiver because the detectives "taunted [her] with Brooks' infidelity and repudiation of her" and provoked an emotional reaction from her to waive her rights. Ibe provides no authority

9

to support her argument, which is further belied by the record. In the video recording of the interrogation, Ibe appears coherent and calm throughout. Moreover, the record shows that Ibe chose to waive her *Miranda* rights with a full understanding of their nature and the consequences of abandoning them. When Ibe expressed her desire to waive, the detective asked if she would like an opportunity to think about it and then left the room for several minutes. After reading the *Miranda* advisement for the second time, Ibe stated that she understood those rights. The detective then explicitly asked Ibe whether she wanted to waive those rights and talk. Ibe responded: "Yeah." The prosecution met its burden to establish Ibe's valid waiver by a preponderance of the evidence. (*Berghuis v. Thompkins*, *supra*, 560 U.S. at pp. 383–384.)

The trial court did not err in denying Ibe's motion to suppress her post-arrest interview statement.

### B. *Assembly Bill No. 518*

Ibe also argues that she is entitled to resentencing because Assembly Bill No. 518 recently amended section 654 to give trial courts discretion to impose a lesser punishment.

At the time of Ibe's sentencing, section 654 required a court to sentence a defendant for an act that was punishable in different ways by different laws only "under the provision that provides for the longest potential term of imprisonment." (Former § 654, subd. (a).) The trial court therefore imposed a term of 25 years to life for count one (conspiracy to commit murder) and stayed execution of the sentences for the remaining counts, finding that the conspiracy count carried the longest potential term of imprisonment.

We issued our original opinion rejecting Ibe's claim that her *Miranda* rights were violated and affirming the judgment on July 29, 2021. Ibe

10

petitioned for review in our Supreme Court, and the petition was denied on October 13, 2021. We issued our remittitur seven days later.

After we issued our original opinion, Assembly Bill No. 518 was enacted, which amended section 654 to provide trial courts with discretion to choose the count on which to impose punishment. On January 3, 2022, before her judgment became final, Ibe filed a motion to recall the remittitur based on the amended law. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 [a judgment becomes final when the time for petitioning for a writ of certiorari in the United States Supreme Court has passed].) We granted Ibe's motion, vacated our prior opinion, and requested supplemental briefing from the parties on the effect of Assembly Bill No. 518.

We agree with the parties that Assembly Bill No. 518 applies retroactively to this case because the judgment was not final at the time the amendment became effective on January 1, 2022. (*In re Estrada* (1965) 63 Cal.2d 740, 744–745 [absent evidence of contrary legislative intent, ameliorative criminal statutes apply to all cases not final when the statute takes effect]; *People v. Sek* (Feb. 1, 2022, B309003) __ Cal.App.5th __ [p. 17] [holding Assembly Bill No. 518 is retroactive].)

The Attorney General argues, however, that remand is not required because at the time of sentencing the trial court believed it had discretion to stay Ibe's sentence on count one and chose not to do so. We are not persuaded.

"Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so." (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.) In *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, the Court of Appeal declined to remand to allow the

11

trial court to exercise its new discretion to strike a three strikes prior conviction where the trial court had imposed the upper term on one count, imposed two discretionary enhancements, and stated on the record that imposing the maximum sentence was appropriate. (*Id.* at p. 1896.) *Gutierrez* reasoned that under these circumstances, the trial court clearly indicated that it would not have exercised its discretion to lessen the sentence, and thus "no purpose would be served in remanding for reconsideration." (*Ibid.*)

Here, the record does not clearly indicate that the trial court would decline to exercise its discretion under Assembly Bill No. 518 to stay the sentence on count one and impose the sentence on a different count. The Attorney General points out that during sentencing the court commented that it had "discretion" and did not have to "choose" count one. But the court also stated it was "required" under former section 654 to impose the sentence on count one because it carried the longest potential term of imprisonment. Thus, the extent of the court's understanding of its authority under former section 654 is uncertain. Furthermore, although the court found aggravating factors when it sentenced Ibe, it also found several mitigating factors, including Ibe's abusive childhood and her lack of a prior record, and the court then applied those factors to impose a lower seven-year sentence for count three. The court also exercised its discretion to strike the 20-year firearm enhancement on count four. Under these circumstances, we cannot categorically conclude that the record clearly showed that the trial court would decline to exercise its discretion to lessen the sentence.

## DISPOSITION

This matter is remanded for resentencing to allow the trial court to exercise the discretion conferred on it by Assembly Bill No. 518. In all other respects, the judgment is affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.



_____

East, J.*




*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Ibe*  A159571

13