Filed 3/10/21  P. v. Roman CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

CARLOS ROMAN,

    Defendant and Appellant.

</td><td>

H046210<br>
(Santa Clara County<br>
Super. Ct. No. 214496)

</td></tr>
</table>

A multi–agency investigation into drug sales and other crimes committed in San Jose by Norteño criminal street gangs, operating under the umbrella of the Nuestra Familia (NF) prison gang, led to the indictment of appellant Carlos Roman, among others.  Roman was convicted by a jury of participating in a criminal street gang, conspiracy to sell methamphetamine, and possession of methamphetamine for sale.  The jury also found true allegations that Roman committed both the conspiracy and possession for sale offenses in order to benefit a criminal street gang.  The trial court sentenced Roman to a total term of 19 years in state prison.

On appeal, Roman argues insufficient evidence supports his convictions for participating in a criminal street gang and conspiracy to sell methamphetamine, as well as the finding that he conspired to sell drugs in order to benefit a criminal street gang.  He further contends that the matter must be remanded for the trial court to exercise its

discretion whether to strike the prior serious felony enhancements in light of Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill 1393).

For the reasons explained below, we reject Roman's contentions of insufficient evidence. Nevertheless, we reverse the judgment and remand the case to allow the trial court to exercise its discretion whether to strike the prior serious felony enhancements under Penal Code sections 667, subdivision (a),[1] and 1385. On remand, the trial court should also consider whether Roman is entitled to the benefit of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136).[2]

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Indictment*

Roman was charged, along with 23 codefendants, in a third amended indictment filed in Santa Clara County Superior Court on December 11, 2017.[3] Specifically, Roman was charged with participating in a criminal street gang (§ 186.22, subd. (a); count 1), conspiracy to sell methamphetamine, with a special allegation that the quantity involved exceeded one kilogram (§ 182, subd. (a)(1), Health & Saf. Code, §§ 11379, subd. (a), 11370.4, subd. (b); count 12), and possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 26).[4] With respect to counts 12 and 26, the indictment alleged that Roman committed these offenses for the benefit of a criminal street gang within the

---

[1] Unspecified statutory references are to the Penal Code.

[2] Senate Bill 136, effective Jan. 1, 2020, amended section 667.5, subdivision (b), to limit prior prison term enhancements to only prior terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b); Stats. 2019, ch. 590, § 1; *People v. Lopez* (2019) 42 Cal.App.5th 337, 340–341.)

[3] Roman was tried with one codefendant, James Gonzalez. Another codefendant, Jacob Dominguez, pleaded guilty and became a cooperating witness. The record on appeal does not indicate the disposition of the cases against the remaining 21 codefendants.

[4] The indictment also charged Roman with unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 27), but the district attorney dismissed that charge prior to trial.

meaning of section 186.22, subdivision (b)(1)(A). The indictment further alleged that Roman had suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12), two prior serious felony convictions (§ 667, subd. (a)) and five prison prior convictions (§ 667.5, subd. (b)).

### B. *Trial*

#### 1. Gang expert testimony

Detective Justin Harper, the lead investigator in the case against Roman, was assigned to the "multi-agency task force to conduct gang investigations [] headed up by the FBI." Harper also testified in Roman's trial as an expert in "criminal street gangs, the Nuestra Familia, controlled substance recognition, usable amounts of controlled substances, and sales of controlled substances." According to Harper, the NF formed within the California prison system in the mid–1960s to protect "other Mexican nationals, Mexican/Americans [*sic*]" from being victimized by the Mexican Mafia, a prison gang formed by Mexican nationals in the late 1950s.

While the organizational structure of the NF has changed over the years, everyone within the gang during the relevant time period was considered a Norteño regardless of rank. The highest–ranking NF members were referred to as "generals" or "carnals," and the second highest rank were "N-Sols" also referred to as a "bro" or "hermano." Whereas carnals had a lifetime commitment "to operate in [] and out of custody" for the NF, N-Sols were only required to operate for the NF when in custody. When out of custody, an N-Sol could choose not to operate for the NF, but even then it was still "highly suggested" that they support two NF members in custody.[5] If an N-Sol failed to support two incarcerated members while he was out on the streets, the NF would "use that as a determination as to whether" the N-Sol was in "good standing" if returned to custody.

---

[5] According to Harper, "support" means "[m]onetary contributions" and "however [the incarcerated members] need" support.

The carnals "put[] people in place out on the streets … to bring all the Norteño criminal street gangs within [a] region [] under the NF umbrella." Individual Norteño gangs in the region were required to pay a monthly tax of $200 or $250 to the "street regiment." The street regiment also imposed a 25% tax on all illegal activity within their region. The money generated from all these taxes was placed in a "regiment bank" and "reinvest[ed] [] into guns, into drugs, and other illegal endeavors to make a profit." Ultimately, the profits were "funnel[ed] [] back into the county jails and the state prison system," to support the carnals, along with "contraband, narcotics[, and] … cell phones, so that the carnals could have open lines of communication out on the streets." Harper testified that there were "probably more than 100 [Norteño street gangs] … within San Jose," all of which the NF sought to control. The San Jose gangs fell under the authority of the NF street regiment assigned to Santa Clara County.

Street regiments were "made up of trusted members from multiple different Norteño gangs." Some street regiment members had never previously belonged to a gang but began operating under the NF umbrella after they were incarcerated. In addition to collecting taxes, street regiments "were responsible for carrying out any NF directives within a geographical region, investigating red–on–red violence, disputes between gangs, [and] collecting incident reports from anybody on the streets that was being investigated." The regiment would report monthly on "who was in line, which Norteño gangs were actually paying their taxes, which weren't, [and] who was giving them problems." The reports, initially sent into the county jails, were reviewed there and then "routed … back into Pelican Bay"[6] for "decisions to be made and handed down." These reports, and other written communication between incarcerated gang members, consisted of microwriting on strips of paper which were rolled up tightly (also referred to as

---

[6] One of the three NF carnals who was directly responsible for "investigation and enforcement" was housed in Pelican Bay.

"kites"), wrapped in plastic and secreted in a body cavity to be passed from one inmate to another.

### 2. Cooperating witness testimony

Roman's jury heard the testimony of five witnesses, each of whom had been part of the NF before cooperating with law enforcement. The witnesses had pleaded guilty to charges brought against them. Each was facing a lengthy prison term but had received no guarantees of leniency in sentencing in exchange for his testimony.

#### a. Ulises Jimenez

Jimenez testified that at the time of his arrest in 2014 he was the NF street regiment commander for Santa Clara County.[7] As the commander, he was responsible for ensuring that the street gangs within his jurisdiction paid their monthly tax, as well as the taxes on drug sales and other illegal activities in the region. Jimenez also supplied the local street gangs with drugs to sell, thereby making money both off that initial sale to the gangs and off the 25% tax the NF levied on the drugs sold by the gangs to users. If a gang failed to pay its taxes, Jimenez would initially try to "educate" the leaders of the gang and persuade them that " 'we could all make money.' " Jimenez tried to avoid resorting to violence but would do so if necessary to get a gang to "fall in line."

Jimenez's regiment sold a variety of illegal drugs, but methamphetamine sales were the "main source of revenue for the regiment." Although Jimenez preferred that street gang members within his jurisdiction sell the drugs he supplied, he testified they could "sell for whoever they want to sell for." He did not have a problem with gang members selling drugs from other suppliers, as long as those members otherwise followed the rules and paid taxes on the NF drugs they sold. Street gang members only paid taxes on NF drugs they sold, not on drugs they obtained from another source.

---

[7] Jimenez testified under a grant of immunity and was qualified to testify as an expert "in the field of knowledge about the NF and Northeners and their function."

Jimenez knew Roman from their incarceration together in the county jail, but Roman was not part of the regiment and was not collecting taxes for the NF. Jimenez had spoken to Roman by phone one time before they met in jail, and Jimenez said he "wanted to meet up with [Roman] because of some other issues that happened with … his wife and my wife."[8] Roman did not have and never has had a gang moniker, but he did socialize with Frank Cruz, who was part of Jimenez's regiment. Jimenez testified at trial that Roman never tried to join his regiment, but Jimenez also testified that he believed "that the police were looking at [Roman]." He was concerned that the police "might be listening to phone calls that [] Roman was involved in."

> b. Aaron Mendoza

Mendoza testified under a grant of immunity. He became involved with the Norteño gang in his neighborhood at an early age, but only started getting "hands-on training" in the NF structure when he was sent to state prison in 2005. Mendoza testified that it was "expected of every northern Hispanic [in prison] to partake in all functions and all aspects that's being handed down" by the NF. It was important to remain in "good standing" with the NF, because otherwise you could get "removed, face sliced, get stabbed, … just various things." There were various ways one could be considered in "bad standing[]," either while incarcerated or out "on the street." Failing to pay "hood taxes," whether it be the monthly $200 tax payable to the street gang or taxes on illegal activities, would put a gang and/or its members in bad standing which could eventually result in physical violence for not fulfilling their responsibilities to the NF. Whenever a gang member is incarcerated, they are immediately "placed on freeze" so the NF can investigate whether they are in good standing.

---

[8] On cross-examination, Jimenez testified that Roman's "wife … or an ex-wife" was involved in a bar fight with Jimenez's wife, and Jimenez wanted to "communicate [with Roman] to make sure that everything was smoothed out."

6

Mendoza was "pulled as a Norteño" after returning to prison on a parole violation in 2006 or 2007. That meant Mendoza had rank within the organization and, upon his release from prison in 2013, he was tasked with overseeing the "street regiment in Santa Clara County" with the title of regiment leader. He was responsible for establishing crews to ensure that money was generated and distributed to the NF members in the region. Mendoza worked "hand in hand" with Jimenez, who had also been directed to run the street regiment for Santa Clara County by a different carnal,[9] for a few months until Mendoza was arrested again while in possession of kites, guns, and drugs.

### c. Jacob Dominguez

Dominguez testified that while he was in custody, at one point he shared a holding cell with Roman's codefendant, Gonzalez. In that cell, Gonzalez showed Dominguez a copy of a police report which included statements that Roman, among others, had made to the police. Gonzalez said that Roman was a "snitch" and Dominguez knew that Gonzalez tried to get "charges brought against [] Roman" by the NF for talking to the police.

On cross-examination, Dominguez said that Gonzalez was also upset with Roman because of a "dispute between women between the two of them." However, the argument between Gonzalez and Roman about a girl took place in a holding cell prior to the time that Gonzalez showed Dominguez the police report reflecting Roman's interview with police.

### d. Josh Morreira

Morreira grew up in South San Jose and first started getting involved with a local Norteño gang in fifth or sixth grade. He was "pulled" as an N-Sol in 2008.

---

[9] According to Mendoza, his authority to run the Santa Clara County regiment came from "NF leaders in Pelican Bay," and Jimenez got his authority from "NF members that were in Corcoran." Mendoza said it was not unusual to have two people working as regiment commander, and his main concern was "to ensure that money and things [] are being distributed in the right places."

In December 2013, Morreira was due to be released from county jail. He received instructions from the NF authority in charge of the jail to reach out to Jimenez and place him on "investigational freeze," pending verification that he was authorized to run the street regiment for Santa Clara County. Morreira was also instructed to establish a street regiment for San Jose. Before he met with Jimenez, however, Morreira independently confirmed Jimenez's authority to run the Santa Clara County regiment. Morreira began working with Jimenez at that point, rather than challenging him over control of the regiment.

A few months later, however, Jimenez was arrested, and Morreira learned he had been placed in protective custody, which was an indication that Jimenez might be cooperating with law enforcement. Morreira was instructed to re-establish the regiment but not to use any gang members who had worked with Jimenez. Morreira directed two other gang members to resume collecting taxes from the street gangs.

Morreira was also selling methamphetamine for the regiment, ultimately selling a half a pound to a full pound a week. He estimated that his profits were $200 per ounce, so a pound of methamphetamine generated $3,200 in profit. Morreira testified that it was possible to sell non-NF drugs and not pay a percentage on those sales to the NF, but only so long as you remained " 'off the radar.' " Once the NF learned what you were doing, "you're going to get approached" and would have to pay "freelance taxes" to the NF.

Morreira did not know Roman before getting involved in the present case and had "barely met him when … in custody." However, Morreira did tell one of the gang members he was working with, Raymond Garcia, that Garcia should stay away from Roman. On cross-examination, Morreira said that the reason he told Garcia to stay away from Roman was not based on "personal knowledge" of Roman but was "based on some kind of hearsay or rumor." Morreira was not asked and did not elaborate further on the "hearsay or rumor" behind his warning to Garcia.

8

e. Albert Lee

Lee testified that he was 12 years old when he was introduced to the gang lifestyle by his cousin, who ran the neighborhood Norteño gang in East San Jose. He hung out with gang members for many years but was only officially " 'jumped in' " when he was 28. Even before he was jumped in, Lee was selling methamphetamine that he obtained from a gang member "off and on." Lee testified that a Northern gang member could sell drugs obtained from non-NF sources as long as they paid taxes on those sales to the NF. In his experience, one can be "considered a Northerner but also [] get[] in trouble for not falling in line or not paying taxes."

3. Harper's expert testimony and opinion on Roman's participation in a criminal street gang

Detective Harper interviewed Roman after his arrest on the indictment. In that interview, Roman admitted buying methamphetamine from someone he knew was a member of an NF street regiment, though he only learned of that person's NF involvement after he started dealing with him. In response to a hypothetical question, Harper testified that in his expert opinion "a hypothetical person, who knowingly sells methamphetamine from the NF, do[es] so with the specific intent to promote, further, or assist criminal conduct by gang members[,] [¶] [so long as the hypothetical person] ha[s] an understanding of how the NF works and how purchasing quantities of methamphetamine from NF drug dealers and where those financial contributions are going." According to Harper, a person who has no knowledge about the NF or criminal street gangs could conceivably buy drugs from an NF source and not have the "intent to promote or further that gang." However, a person who has such knowledge, "who knowingly sells methamphetamine from the NF but also sells methamphetamine that he gets from other sources" is still selling methamphetamine he obtained from the NF "with the specific intent to promote, further, or assist criminal conduct by gang members."

9

In his interview with Detective Harper, Roman admitted he was in contact with Lorenzo Guzman, an NF carnal, via a contraband cellphone that Guzman possessed while in custody. Roman also stated that he put other people in contact with Guzman. At the house where Roman was arrested, police discovered a cellphone with Roman's name scratched on the cover that contained a number of telephone contacts in common with contacts stored in Guzman's contraband cellphone.[10] Harper testified that Roman had previously been convicted, along with Guzman, of "conspiracy with a gang enhancement." In Harper's expert opinion, "[i]f a hypothetical gang member was putting gang members who were out on the street in touch with an imprisoned NF carnal" that person would be "willfully promoting, furthering, or assisting in felonious criminal conduct by members of that gang." Roman had several gang tattoos, including " 'Norte' " across his stomach, " 'San Jo' " across his shoulder blades, and male and female clown faces on his chest. The male clown is depicted wearing a baseball cap with " 'ES Hoods' " written on it, and Harper explained that was an abbreviation for " 'East Side Hoods,' " a Norteño street gang which Roman was "part of when he was younger."

Harper also testified that Roman admitted being "sent a kite asking [] whether or not he wanted to function" when he was out of custody. To Harper, this indicated that Roman had been "pulled" at some point as a "bro" or "N-Sol." Harper testified that "once you're elevated to an N-Sol or bro status, it comes with a lifetime commitment to function behind the walls, but an optional commitment to function on the streets." Regardless, if an N-Sol decides to commit offenses on the street, they are obligated to "do so under the purview of the NF and pay taxes and contributions." The NF would not accept an N-Sol operating independently on the streets.

---

[10] In that house, police also discovered a "camouflage-patterned ballistics vest," which was identical to a ballistics vest seized at the home of Raymond Garcia. Harper testified that "[m]ilitary body armor is kind of rare" and in his opinion the fact that Roman and Garcia were associated with identical body armor was more evidence of Roman's active participation in a criminal street gang.

Although Roman was "green-lit"[11] during this case, Harper did not believe that meant he was not a Norteño gang member, because members can be "green-lit for any number of reasons." On cross-examination, Harper acknowledged that he had not seen Roman's name mentioned in any of the kites seized from various gang members in this case.

In Harper's expert opinion, Roman was actively participating in the Norteño gang from January 1, 2013 to October 30, 2014, the dates covered by the charges against him.

C. *Verdict and sentencing*

The jury found Roman guilty of participating in a criminal street gang (count 1), conspiracy to sell methamphetamine (count 12), and possession of methamphetamine for sale (count 26). The jury also found true the allegations that Roman committed counts 12 and 26 for the benefit of a criminal street gang. The jury found not true the special allegation that the quantity of methamphetamine involved in count 12 exceeded one kilogram by weight.

Following the trial, Roman admitted the allegations that he had two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12), two prior serious felony (§ 667, subd. (a)), and two[12] prior prison convictions(§ 667.5, subd. (b)).

At the July 20, 2019 sentencing hearing, the trial court granted Roman's *Romero*[13] motion in part, dismissing one of his two strike priors. The court then sentenced Roman to an aggregate term of 19 years in state prison, consisting of the upper base term of four years on the conspiracy conviction in count 12 (doubled to eight years due to the remaining strike prior) plus two consecutive five-year terms for the two prior serious

---

[11] According to Harper, someone is "green-lit" by the NF if they are "targeted by the organization for assault, removal, [or] murder."

[12] Although the third amended indictment alleges that Roman had five prison prior convictions, we found nothing in the record explaining the disposition of the three other prison prior allegations.

[13] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

11

felony convictions (§ 667, subd. (a)) plus a consecutive one-year term (one-third the middle term of three years) on a separate case.[14]  The court struck the gang enhancement (§ 186.22, subd. (b)(1)(a)) on count 12 pursuant to section 186.22, subdivision (g).  The court imposed and stayed a six-year term (twice the upper term of three years) on count 1 and a 16-month term (one-third the middle term of two years, doubled due to the remaining strike) on count 26 under section 654.  Finally, the court imposed and stayed the one-year prior prison term enhancements on counts 1 and 26 pursuant to *People v. Jones* (1993) 5 Cal.4th 1142.

The trial court imposed a total restitution fine of $600 (§ 1202.4, subd. (b)) and imposed, but suspended, a parole revocation restitution fine of $600 (§ 1202.45).[15]  The court further ordered Roman to pay a court operations assessment of $160[16] (§ 1465.8), a criminal conviction assessment of $120[17] (Gov. Code, § 70373), a criminal justice fee of $129.75 payable to the City of San Jose in the underlying case (Gov. Code, §§ 29550, 29550.1, 29550.2), a criminal justice fee of $259.50 payable to Santa Clara County in docket No. C1772001 (Gov. Code, §§ 29550, 29550.1, 29550.2), a drug program fine of $150 (penalty assessment waived) (Health & Saf. Code, § 11372.7), and a crime lab fine of $50 (penalty assessment waived) (Health & Saf. Code, § 11372.5).  Finally, the court awarded total credits of 2,676 days, consisting of 1,338 days of custody credits plus 1,338 days of conduct credits pursuant to section 4019.

Roman timely appealed.

---

[14] In that case, Santa Clara County Superior Court case No. C1772001, Roman was charged with possession of a controlled substance while incarcerated (§ 4573.6).  At the change-of-plea hearing in the instant case, in which he admitted the various prior conviction allegations, Roman pleaded no contest to the charge in case No. C1772001.
[15] $400 in the underlying case and $200 in case No. C1772001.
[16] $120 in the underlying case and $40 in case No. C1772001.
[17] $90 in the underlying case and $30 in case No. C1772001.

## II. DISCUSSION

A. *Sufficiency of the Evidence*

Roman argues that his convictions for participating in a criminal street gang and conspiracy to sell methamphetamine, as well as the jury's finding on the criminal street gang enhancement allegations, must be reversed because the prosecution failed to present sufficient evidence to support those verdicts at trial. We disagree.

### 1. Standard of review

"In addressing a claim of insufficient evidence to support a conviction, this court ' "reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.] 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 345 (*Jackson*).) We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).)

The standard of review for addressing a claim that there was insufficient evidence to support a sentencing enhancement is the same as for a criminal conviction. "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*Young, supra*, 34 Cal.4th at p. 1181.)

13

2. Substantive gang offense

"The elements of the gang participation offense in section 186.22[, subdivision] (a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) "[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help members of his gang commit felonious criminal conduct. The plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. (See § 186.22, subd. (i).)" (*Id.* at p. 1132.)

Roman argues that this conviction must be overturned because the prosecution failed to present sufficient evidence to show that he " 'was a functioning member of a gang during the relevant period of time.' " We disagree that the jury heard insufficient evidence to convict Roman of count 1. Detective Harper recounted the evidence supporting his opinion that Roman was "actively participating in the Norteño gang" when he committed the offenses at issue. Harper's expert opinion, based on his lengthy, substantive experience in gang investigations, as well as his direct involvement in the multi-agency investigation that led to the charges against Roman, is substantial evidence to support the jury's verdict. (See *Albillar*, *supra*, 51 Cal.4th at p. 63.)

In addition, there was evidence that Roman, during his most recent incarceration, had been "pulled" as an N-Sol.[18] Roman correctly notes that there was testimony that an

---

[18] The evidence on this was not conclusive, and Harper testified that he did not have any "independent confirmation" that Roman was an N-Sol. However, Roman himself acknowledges that N-Sols can choose whether to function as part of the gang while out of custody to support his claim that he was not an active participant.

14

N-Sol, unlike a carnal, could choose whether to operate for the gang while out of custody and that choice was generally respected within the NF. However, Harper testified that the NF requires that all out-of-custody N-Sols support two incarcerated gang members, regardless of whether the N-Sol is then functioning as a member in the eyes of the NF. An N-Sol who fails to provide such support, which could be money or other assistance, could be found to not be in good standing upon their return to custody. Accordingly, the evidence of Roman's status as an N-Sol, at best, cuts both ways on the question of whether he was actively participating in the gang. He may have chosen not to function, but still fulfilled his obligations to support incarcerated NF members, in which case he was an active participant within the meaning of section 186.22. Or, he may have chosen not to function and decided not to provide support to incarcerated members—despite the risk of retaliation—in which case he was not an active participant. Based on the evidence before it, the jury was entitled to conclude that Roman was functioning within the gang, even if only by supporting incarcerated NF members, and we cannot reverse the judgment merely because " 'the circumstances might also reasonably be reconciled with a contrary finding.' " (*Jackson*, *supra*, 1 Cal.5th at p. 345.)

Roman's admission that he remained in contact, via a contraband cellphone, with Guzman, an incarcerated NF carnal, provides even more significant evidence of his active participation in the criminal street gang. While Roman points to some evidence that his telephone contacts with Guzman simply involved collecting a debt for a vehicle that another gang member owed to Roman, Roman also admitted that he put other individuals in contact with Guzman. When authorities searched Guzman's phone, certain phone contacts matched up with phone numbers found in Roman's phone. Based on the totality of this evidence, it was reasonable for the jury to conclude that Roman's contacts with Guzman were focused not solely on securing repayment to Roman for a vehicle, but

Accordingly, the jury was entitled to conclude that he was, in fact, "pulled" as an N-Sol in prison.

15

instead extended to gang business. Guzman and Roman could have discussed such mundane issues as a vehicle debt on a jail telephone call, which would of course be monitored and recorded. The jury could have reasonably concluded that Guzman would reserve the use of his contraband cellphone for official gang business and other illicit activity, thereby completely avoiding the prison's monitoring and recording system. That Roman and Guzman had previously been jointly tried and convicted of "conspiracy with a gang enhancement" provides further evidence supporting Roman's conviction of count 1.

Next, Roman argues that the evidence of his having been disciplined by the gang shows that he was not actively participating, but rather was being punished for not participating. Like the evidence of Roman's status as an N-Sol, this evidence cuts both ways. Roman could have been disciplined because he was selling non-NF drugs and not paying taxes. In that case, his actions would not amount to active participation. However, Roman could have been disciplined because he was actively participating in the gang, selling NF drugs, but also selling non-NF drugs on the side and not paying taxes. It was within the jury's exclusive provenance to evaluate the evidence and resolve this question against Roman. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

More compelling evidence of Roman's active participation in the gang came from Roman's interview with Detective Harper, in which Roman surmised that he was indicted for gang offenses because the person he was "getting dope from" was "gang-related or whatever." When Harper asked Roman if he knew the person he bought drugs from was "operating in the reg[iment]," Roman said he did not know "[a]t the time." Roman admitted discovering his supplier's gang affiliation "a little after [he] started dealing with him."

Roman's admissions give rise to at least two reasonable inferences. First, although Roman did not know at first that his supplier was operating in the regiment, he nevertheless continued to purchase drugs from him even after he became aware of that

16

fact.  Second, Roman's admission that he knew his supplier was operating "in" the regiment implies that at least some of the drugs he purchased were NF drugs.  Although Roman argues on appeal, as he did at trial, that there was some evidence his supplier may have been freelancing and selling him non-NF drugs, the jury could reasonably conclude that Roman's admissions meant that he knew he was buying some NF drugs from a Norteño gang member.  As an N-Sol, Roman had to know that those purchases were actively benefiting the NF.

Based on this evidence, and drawing all inferences in favor of the verdict, we conclude substantial evidence supports Roman's conviction for participating in a criminal street gang.

### 3.  Criminal street gang enhancement allegation

"The substantial evidence standard of review applies to section 186.22 gang enhancements."  (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.)  "To prove a gang allegation, an expert witness may testify about criminal street gangs."  (*People v. Romero* (2006) 140 Cal.App.4th 15, 18.)  "The crucial element [of a gang allegation] requires that the crime be committed (1) for the benefit of, (2) at the direction of, or (3) in association with a gang.  Thus, the typical close case is one in which one gang member, acting alone, commits a crime."  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)  "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime."  (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

Roman repeats his argument that there was not sufficient evidence to support the gang enhancement allegations because there was some evidence to show that his supplier, though a regiment member, may have been freelancing and selling non-NF drugs to Roman.  Thus, according to Roman, the jury had no rational basis to conclude that Roman's drug sales were actively promoting a criminal street gang.  Again, we disagree.

17

As discussed above, the jury was presented with substantial evidence that Roman was actively participating in the gang at the time he was selling methamphetamine. He remained in contact with Guzman, an NF carnal, via Guzman's contraband cellphone and put other people in contact with Guzman. Searches of Roman's cellphone and Guzman's contraband phone disclosed that they had several common telephone contacts stored in their respective phones.

Roman also admitted that at least some of the methamphetamine he sold was acquired from someone he knew was operating in the street regiment. As an N-Sol, Roman understood any NF drugs he sold would benefit the NF. By selling drugs he obtained from someone he knew was a gang member, Roman was directly assisting criminal conduct by gang members. This evidence is sufficient to support the jury's findings on the criminal street gang enhancement allegations.

### 4. Conspiracy to sell methamphetamine

Finally, Roman argues that, without evidence showing that the methamphetamine he sold was supplied by the NF, no reasonable trier of fact could conclude that he was part of the alleged conspiracy to sell methamphetamine in association with the NF.

The evidence, discussed in detail above, was more than sufficient to permit the jury to conclude that Roman was continuing to function within the NF, and that he purchased methamphetamine from someone he knew was "operating in the reg[iment]." That evidence was " ' "reasonable, credible, and of solid value." ' " (*Jackson*, *supra*, 1 Cal.5th at p. 345.) In any event, it is not for us to decide that because there was some evidence to support Roman's position that he was operating entirely on his own and not selling drugs to benefit the NF, the jury should have acquitted him. We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency. (*Young*, *supra*, 34 Cal.4th at p. 1181.) Based on our review of the evidence, we decide sufficient evidence was presented to support Roman's conviction for conspiracy to sell methamphetamine.

18

For these reasons, we reject Roman's contentions that insufficient evidence supports the jury's convictions and true finding against him.

B. *Remand under Senate Bill 1393*

Senate Bill 1393, effective January 1, 2019, amended section 1385 to give trial courts the discretion to dismiss prior serious felony conviction enhancements imposed under section 667, subdivision (a). (Stats. 2018, ch. 1013, §§ 1, 2.) The California Supreme Court has held that Senate Bill 1393 applies retroactively to defendants, like Roman, whose sentences were not yet final when it came into effect. (*People v. Stamps* (2020) 9 Cal.5th 685, 699.) We now decide whether a remand to the sentencing court is necessary or if it would be an " 'idle act.' " (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901 (*Gamble*).)

Generally, "when the record shows that the trial court proceeded with sentencing on the [] assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) The rationale for this general rule is that "[d]efendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*Ibid*.) There is an exception to this rule, however, where " 'the record shows that the trial court would not have exercised its discretion even if it believed it could do so,' " in which case, " 'remand would be an idle act and is not required.' " (*Gamble*, *supra*, 164 Cal.App.4th at p. 901.)

A "remand [for resentencing] is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a[n] [] enhancement." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) The salient question is whether the trial court "express[ed] its intent to impose the maximum sentence permitted." (*Id*. at p. 427.) "When such an expression is reflected in the appellate record, a remand would be an idle act because the record

contains a clear indication that the court will not exercise its discretion in the defendant's favor." (*Ibid*.) Without a clear indication of the trial court's intent, remand is required. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110–1111.)

In this case, we have no clear indication how the trial court might have exercised its discretion. The trial court sentenced Roman with a mixture of severity and lenity. It imposed the upper term on count 12 and imposed—but stayed—the upper term on count 1, which would indicate it would not be inclined to strike the sentencing enhancement. On the other hand, the trial court did strike the criminal street gang enhancements associated with counts 12 and 26 and, before pronouncing sentence, struck one of Roman's two strike priors. On this record, we determine that remand is necessary for the trial court to consider, in its discretion, whether to dismiss the prior serious felony enhancements imposed under section 667, subdivision (a).

### III.    DISPOSITION

The judgment is reversed. The matter is remanded for the limited purpose of permitting the trial court to determine whether to strike the Penal Code section 667, subdivision (a) enhancements under Penal Code section 1385 and the prior prison term enhancements under Penal Code section 667.5, subdivision (b). If the trial court strikes the enhancements, it shall resentence defendant accordingly and transmit amended abstracts of judgment to the Department of Corrections and Rehabilitation. If the trial court declines to strike the enhancements, it shall reinstate the original sentence.

_____

                                 Danner, J.

WE CONCUR:

_____

Elia, Acting P.J.

_____

Bamattre-Manoukian, J.

**H046210**
***People v. Roman***